DIVISION 1142, AMALGAMATED ASSOCIATION OF STREET ELECTRIC RAILWAY AND MOTOR COACH EMPLOYEES OF AMERICA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 16007.

United States Court of Appeals District of Columbia Circuit.

Argued May 15, 1961.

Decided July 6, 1961.

Petition for Rehearing En Banc Denied En Banc Sept. 12, 1961.

Mr. George Schatzki, Dallas, Tex., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court, and Mr. L. N. D. Wells, Jr., Dallas, Tex., with whom Mr. Bernard Cushman, Washington, D. C., was on the brief, for petitioner.

Mrs. Nancy M. Sherman, Atty., N. L. R. B., with whom Messrs. Stuart Rothman, Gen. Counsel, N. L. R. B., Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., and Miss Rosanna A. Blake, Atty., N. L. R. B., were on the brief, for respondent.

Before WASHINGTON, DANAHER and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge.

Petitioner [Union] seeks review of a decision and order of respondent [Board] dismissing in its entirety a complaint based on charges that Continental Bus System, Inc. [Continental] had engaged in unfair labor practices by refusing to bargain in good faith, as required by § 8(a) (5) and (1) of the Labor Management Relations Act of 1947,[1] and had engaged in surveillance of union representatives, in violation of § 8(a) (1) of the Act. Petitioner further contends:

> "The Board erred in failing to note, or consider, the union's exceptions to the Examiner's Report, and in failing to state sufficiently, or to support with reasons, its rulings on material exceptions to the decision of its Examiner, all in contravention of the requirements of Section 8(b) of the Administrative Procedure Act [5 U.S.C.A. § 1007(b)], and the Board's own Rules and Regulations."

### I. Refusal to Bargain

The Union had represented employees of Continental since approximately 1937; and, until 1958, the Company and the Union had enjoyed an unbroken record of harmonious and successful bargaining. There had never been a strike, and the Company had always advised the Union of its financial status.

In April 1958, the parties met to negotiate a new contract to replace the one due to expire on May 15, 1958. At that meeting, the Union submitted a proposal calling for general wage increases and a disability and retirement plan. A few days later, when the negotiators again met, Company representatives informed the Union that Continental was then operating at a loss and, because of its poor financial condition, would be unable to grant any Union proposal entailing increased cost. The Company pointed out that every bit of income was needed to meet existing commitments. It sought to renew the contracts, indicating

---

1. 61 Stat. 136, 29 U.S.C.A. § 151 et seq.

that with the tourist season then approaching there might be a later opportunity to meet at least in part, from the expected increase in revenue, some of the Union's demands. The Union rejected the Company's proposal that the existing contracts be extended for one year. At later meetings held immediately before expiration of the contracts, the Company proposed that they be extended for sixty days but the Union agreed only to a day-to-day extension.

At the next conference, on June 30, the Company rejected a Union proposal and offered a counter-proposal which offered slight wage increases. The Union claims the counter-proposal was not offered in good faith as it discriminated between classes of employees represented by the Union. When the counter-proposal was submitted, the Company informed the Union that, if a strike were called, the Company's financial condition would worsen and, as a result, it would have progressively less to offer. Certainly, the Company at all times candidly stated its financial position to the Union. A strike commenced on July 2, 1958.

The parties were unable to conclude an agreement and, in October, the Company resumed operations. All Union employees who returned to work at that time were given full seniority rights, and, where necessary, new employees were hired to replace Union members who remained on strike. Subsequent negotiations extending until the beginning of December failed to result in agreement, primarily because of an impasse over the Union's demand that employees who had remained on strike be reinstated with full seniority. The Company's position was that, by then, it had incurred obligations to its new employees and that it was financially unable to satisfy those obligations while, at the same time, giving all returning Union members the seniority they had enjoyed prior to the strike. No agreement was ever reached.

Appellant's arguments on this point tacitly equate refusal to bargain in good faith and refusal to recede from an announced position. In many instances such argument might be persuasive, but that is not the case here. At the start of negotiations, the Company had stated that it was financially unable to pay increased wages. There is no suggestion that the Company's position was not taken in good faith, and the trial examiner found that the general counsel had failed to prove otherwise.

The Board found that the Company had sincerely attempted to reach agreement with the Union, and we think the record before us furnishes substantial evidence to support that conclusion. The Union's extreme demands—increases of 100% in some aspects—the Company's insecure financial position, its long record of cooperation with the Union, the previously good personnel relations, and the Company's continuation, even during the strike, of a voluntary program of retirement were among the factors which were surely entitled to weight. Such evidence discloses a substantial basis for the Board's conclusion that the Company had not been shown to act in bad faith.

## II. Surveillance

■■■ As the strike progressed, it developed that from time to time there were concentrations of "cars and men, three, four, five, six cars, carloads of striking employees" at or near the Company's premises "generally speaking at night." It is a matter of common knowledge that tempers rise and industrial strife results from incidents which develop under such circumstances. The Company, with several million dollars of property at stake, decided upon protective measures, and for that purpose employed C & I Protection, Inc. to furnish guard service. The C & I concern was controlled by one Smith, who also was in control of a subsidiary known as Truth Verification, Inc., the president of which was one Baker. The Union was engaged in controversy, not only with the Company here, but also with others. After anonymous threats to the safety of members of Baker's family had

been received, it developed that Truth undertook to place microphones in various locations to ascertain the source of the threats. The Company here had not employed Truth for any purpose.

There can be no question that had the Company engaged in "bugging" hotel rooms or offices occupied by members of the Union, to enable it to obtain information useful in its negotiations, we would regard such conduct as reprehensible and as an unfair labor practice.

The C & I president, one Keener, under subpoena by the general counsel, appeared at the first hearing but was excused. Because of a heart condition, for the fourth time he was admitted to the hospital until he might be physically able to testify. It does not appear that either the general counsel or the Union made any effort whatever to obtain Keener's testimony. On the contrary, the parties stipulated that Keener would testify that the services had been undertaken for the benefit of Baker and C & I, as described by the witness Smith.

It was further stipulated that Baker would testify as had Smith. Although the general counsel had obtained a subpoena for Baker, he did not call Baker as a witness.

The Company's vice president, Reece, examined on the point, testified that he learned of the "bugging" when he was asked if he could identify any of the voices on a playback derived from the bugging. There was no evidence that anything said bore upon the negotiations or was in any way related to the controversy under scrutiny. Reece testified further that he had no knowledge of how the recordings were obtained, had

no knowledge of threats against Baker, and that he had been asked only to identify the voices.[2]

Granting, as the Board noted, that the circumstances were suspicious, the Board concluded that the record failed to show by a preponderance of the evidence that the Company was responsible for the surveillance. The Board adopted its trial examiner's findings on this point, from which we quote:

"The fact that Truth engaged in surveillance of Connally, by bugging his rooms at the Travis Hotel at various times and by having him shadowed, is undisputed. However, the record affirmatively shows, as pointed out in the Respondent's brief, that because of a threat received by Baker, president of C & I, Truth caused an investigation to be made, including surveillance of Connally's activities; that the only payments made by the Respondent were to C & I; that the first Reece knew of the bugging was when Keener requested his assistance in the identification of voices on parts of certain recordings; and that the Respondent neither authorized nor had anything to do with the bugging. This affirmative evidence is presented by exhibits and through the uncontradicted testimony of Reece and Smith. The question remains for the Trial Examiner as to whether or not such affirmative evidence should be disregarded and Reece and Smith discredited.

"From their demeanor as witnesses, Reece and Smith both impressed me favorably. Smith's tes-

2. Our dissenting colleague is discussing a possible situation which sometime might arise but which did not here exist. Reece was asked to identify voices. The evidence shows they were almost inaudible. Whatever was said was unintelligible. There is nothing whatever to show that the playback was related to any subject but the threats of violence to Baker's family. There is nothing to show its relationship to the instant case rather than to some of the other companies. Reece dismissed the episode from his mind almost immediately.

The trial examiner and the Board fairly could conclude that Continental was under no obligation to advise the Union that efforts were being made to identify the source of threats of illegal violence against Baker and his family.

timony stands uncontradicted, as does Reece's in this connection. While Smith was verbose, he was forthright and not evasive or contradictory in his testimony. There are no conflicts between his testimony and that of Reece. Under the circumstances, while the evidence as a whole raises suspicions, I do not believe that the inference urged by the General Counsel is justified. For the above reasons I credit the above testimony of Reece and Smith and find that the Respondent did not engage in the alleged surveillance."

Both the examiner and the Board have concluded that there was a failure of proof of Company participation in the circumstances as to which complaint has here been urged. We find ourselves in no position, on the record before us, to substitute contrary findings of our own. We think the Board at least was entitled to conclude that the Company had not, on this account, engaged in an unfair labor practice. Indeed, strikers who applied for reinstatement when operations were resumed were put back to work with full seniority. The Company rehired all strikers who applied for work. When, later, the Company needed more employees, it so advised the Union and the former employees and offered to recall strikers to fill jobs then available.

### III. The Board's Failure to Recite and Rule upon the Union's Exceptions with Specificity

■ The third major contention urged here is an asserted violation of the Administrative Procedure Act and of the Board's own Regulations in the Board's failure to recite with specificity the Union's exceptions to the preliminary report of the trial examiner and to rule upon them point by point, making detailed findings of fact and conclusions of law.

The examiner's report in this case is a careful and detailed document, covering some thirty-seven pages in the printed record. By pointing out the voluminous record of the hearing and noting that the examiner meticulously commented on all disputed facts and all questions of credibility, inferences and the like, the Board, we think, aptly answers appellant's contention that the examiner failed to recite in his report many undisputed facts. We know of no rule barring an administrative body from adopting the intermediate report of a trial examiner *in toto*, and it is obvious to us that that is exactly what the Board did in this case. The Board's opinion stated that all exceptions pressed before it had been considered, and this, in our view, is sufficient under the circumstances here, to satisfy any applicable requirement of specific format for the Board's opinions.

As we stated earlier, all disputed conclusions are amply supported by substantial evidence. The order of the Board is therefore

Affirmed.

WASHINGTON, Circuit Judge (dissenting).

The "bugging" of the hotel rooms of the Union negotiators is to me a clear violation of Section 8(a)(1) of the National Labor Relations Act. No matter how it was arranged, or on what pretext, the Continental Bus System negotiator was advised of it while negotiations with the Union were in progress, listened to recordings (though he says he did not understand them), and allowed the "bugging" to continue. Continental paid $5,087.05 for "Services Rendered," on bills which did not contain any itemized description of the services being paid for: other bills for "Janitor Services," "Guard Service" and "Patrol Service" were itemized, and were paid, in addition to the unitemized bills. It would seem most unrealistic to conclude—as the Board apparently did—that no payment was made by Continental for the surveillance, or that Continental would not have taken advantage of any useful information uncovered. Perhaps Continental did not initiate the surveillance

and got no actual advantage from it. But that is not the question. The conduct was not only reprehensible but held the potential of giving great (and unfair) advantages to Continental in its negotiations. Yet Continental neither took steps to stop it nor to advise the Union that it had occurred or was continuing. I think an unfair labor practice was thus committed, and that the case should be remanded to the Board for reconsideration of the charges made under Section 8(a)(5) in the light of the violation of Section 8(a)(1).