**SCHMERLER FORD, INC., et al.,**
**Petitioners,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**No. 17659.**

United States Court of Appeals,
Seventh Circuit.

April 8, 1970.

Hastings, Senior Circuit Judge, dissented.

George B. Christensen, Richard F. Vitkus, Ronald R. Baird, Chicago, Ill., for petitioners; Winston, Strawn, Smith & Patterson, Chicago, Ill., of counsel.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, John D. Burgoyne, Janet C. McCaa, Attys., National Labor Relations Board, Washington, D. C., for respondent.

Before HASTINGS, Senior Circuit Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

This petition is to review an order of the National Labor Relations Board concluding that petitioners each committed an unfair labor practice by refusing to bargain collectively with the American Federation of Professional Salesmen (the "Union"), in violation of Sections 8(a) (1) and 8(a) (5) of the National Labor Relations Act (29 U.S.C. §§ 158(a) (1) and 158(a) (5)).

Petitioners are 24 automobile dealers in the metropolitan Chicago area. In 1968, pursuant to Section 9(c) of the Act (29 U.S.C. § 159(c)), the Union filed petitions seeking to represent the salesmen at each of these automobile dealers. In April and May 1968, following hearings before a hearing officer of the Board, the Regional Director ordered elections to be held among the employees after finding that the Union was a labor organization within the meaning of Section 2(5) of the Act (29 U.S.C. § 152(5)).

Petitioner automobile dealers requested the Regional Director to dismiss the Union's petitions for representation on the ground that the Union was conspiring to violate the Sherman Act. The dealers showed that they had received letters of demand for recognition from the Union in January and February 1968, in which the Union stated that its proposed collective bargaining agreement "could guarantee you, and all the dealers in the area, a minimum net profit (I repeat NET) equal to 3% of the list price of the unit [automobile]." This language was omitted from subsequent demand letters. In literature distributed to various automobile salesmen, the Union stated they should join "[t]o put your employer back into the retail business by guaranteeing him a net profit, after all expenses are paid, equal to 3% of the list price." The Union discussed its possible pricing formula at an organizing meeting on January 28, 1968, giving the following example for a car invoiced by the factory to the dealer at $3,120:

"To this invoice of $3120 we would add one quarter of one per cent for

our health and welfare program, which is $10. We would add another one quarter of one per cent for our retirement program, which is another $10. We would add 4½ per cent as the sales commission, which is $180. We would add 2 per cent for the service, get-ready, advertising, and office expense of the dealer, which is $80. We could then guarantee the dealer a minimum profit equal to 3 per cent of the list price of the car, which is $120.

"We could guarantee this and we would guarantee it by Article 8, which is the one I didn't read before.

"Article 8 of our [collective bargaining] agreement would read as follows:

'Salesmen will not be required to sell a new motor vehicle at a price less than 12 per cent off the list price less transportation and delivery of the motor vehicle. We take the 12 per cent off and we are right down to this figure of $3520'."

In denying the dealers' motions to dismiss the petitions for representation, the Regional Director stated that it was speculative whether the Union, if selected as the salesmen's bargaining representative, would actually seek to incorporate this pricing formula into a collective bargaining agreement. He concluded that since the Union qualified as a labor organization within the meaning of Section 2(5) of the Act, the Board should process the representation petitions. He did not indicate, however, that the Union's proposal was valid under the Sherman Act.

The antitrust issue was again raised in the dealers' petitions to review the Regional Director's order, but the Board concluded that these petitions raised no substantial issues warranting review and therefore denied them. In the ensuing elections, the Union received a majority of the ballots counted and was certified as the exclusive bargaining representative of petitioners' salesmen.

As the certifications issued, the Union requested the dealers to commence negotiations for a collective bargaining contract, but its communications were unanswered. Therefore, the Union filed charges with the Board alleging that petitioners each committed an unfair labor practice by refusing to recognize it and bargain collectively with it. In November 1968, a trial examiner conducted a hearing with respect to the unfair labor practice alleged in the complaints filed by the Board's general counsel. In their answers the petitioners denied that the Union was a labor organization within the meaning of Section 2(5) of the Act and asserted that its certification was invalid, primarily because of its price-fixing program. The trial examiner rejected these contentions. As to whatever collective bargaining agreement the Union might propose, the trial examiner stated "the Employer could dispose by saying nay to price fixing and aye to working terms and conditions." He also noted that the Board had already rejected the dealers' price-fixing contention in the representation proceedings. The findings, conclusions and recommendations of the trial examiner were adopted by the Board, and it simultaneously overruled the dealers' exceptions. Consequently, the dealers were ordered to cease and desist from the unfair labor practices found, to bargain collectively with the Union and to post the customary notices. 175 NLRB No. 90 (1969).

Absent an affirmative defense, petitioners' adamant refusal to bargain collectively with the certified representative of their employees clearly violates Sections 8(a) (1) and 8(a) (5) (29 U. S.C. §§ 158(a) (1) and 158(a) (5)). Petitioners no longer contend that the Union is not a labor organization within the purview of Section 2(5) of the Act (29 U.S.C. § 152(5)). Rather, they present a dual attack—first against the validity of the Union's election and then the propriety of granting recognition to the Union as bargaining representative in light of the proposed price-fixing scheme.

■ Initially, the Board objects that petitioners should be barred from challenging the election results because of their failure to file objections thereto within the five-day period required by the Board's Rules and Regulations (Series 8, Section 102.69(a)). National Labor Relations Board v. Conlon Bros. Mfg. Co., 187 F.2d 329, 332–333 (7th Cir. 1951). In exceptional circumstances, however, this Court has considered objections to elections lodged after expiration of that period. National Labor Relations Board v. Fresh'nd-Aire Company, 226 F.2d 737, 741–742 (7th Cir. 1955). In this case, the dealers presented objections to the Regional Director and the Board prior to the representation election. Their failure to reassert their antitrust point in post-election proceedings until their answers to the unfair labor practice complaints should not preclude them from raising the same point in the unfair labor practice proceedings or before this Court. They may not, however, go beyond the issues thus raised and advance additional allegations and evidence pertinent to the representation proceedings. Rockwell Mfg. Co., Kearney Div. v. National Labor Relations Board, 330 F.2d 795, 797–798 (7th Cir. 1964), certiorari denied, 379 U.S. 890, 85 S.Ct. 161, 13 L.Ed.2d 94; see National Labor Relations Board v. Golden Age Beverage Company, 415 F.2d 26, 32–33 (5th Cir. 1969).

■ Within these confines we turn to consider the dealers' arguments. They first contend that the election was invalid because the Union's campaign propaganda contained descriptions of the pricing proposals which allegedly misled the employees and prevented a fair election. Even assuming that the proposals were actually illegal and persisted after the Union filed its request for an election, nothing in these proposals warrants setting aside the certification election as unfair as a matter of law.

■■ The Board is not a censor over the campaign propaganda circulated by either union or management during a representation election. Linn v. United Plant Guard Workers, 383 U.S. 53, 60–61, 86 S.Ct. 657, 15 L.Ed.2d 582. Correction of deceptive or untruthful statements is left primarily to the participants themselves and the good sense of the voters. National Labor Relations Board v. Red Bird Foods, Inc., 399 F.2d 600, 602–603 (7th Cir. 1968); National Labor Relations Board v. Golden Age Beverage Company, 415 F.2d 26, 31 (5th Cir. 1969). The Board intercedes to set aside elections only when improper campaign tactics touch material matters and create a climate which thwarts the employees' free choice and distorts the electoral process. Gallenkamp Stores Co. v. National Labor Relations Board, 402 F.2d 525, 533 (9th Cir. 1968); Aerovox Corp. of Myrtle Beach, S. C. v. National Labor Relations Board, 409 F. 2d 1004, 1007 (4th Cir. 1969); Southwest Portland Cement Company v. National Labor Relations Board, 407 F.2d 131, 134–135 (5th Cir. 1969).

■ In determining whether an election has been unfair, the accused conduct must be considered with reference to the "timing, proportion of employees affected, and the character" of the claimed coercive or misleading action. Rockwell Mfg. Co., Kearney Div. v. National Labor Relations Board, 330 F.2d 795, 797 (7th Cir. 1964), certiorari denied, 379 U.S. 890, 85 S.Ct. 161, 13 L. Ed.2d 94. In this case, the dealers have not objected to a misrepresentation of fact or even of law. Their contentions pertain to certain of the Union's proposals, assertedly illegal, which were advanced as potential elements of a collective bargaining agreement. There is no actual evidence of the prominence of the illegal proposals in the overall campaign of the Union or of the number of employees to whom these proposals were communicated. The record contains no indication how long these assertions persisted after the petitioners objected to the illegality of the scheme. There is no proof that the scheme won the election for the Union. There is no suggestion that the Union cynically suggested a

pricing program which it considered illegal in the hope of misleading voters. *Cf.* United Electrical, Radio and Machine Workers v. National Labor Relations Board, 133 U.S.App.D.C. 115, 409 F.2d 150, 158–159 (1969). Long before the election, the dealers here were well aware of the propaganda proposals and were free to respond by pointing out any defects, legal or otherwise. National Labor Relations Board v. Red Bird Foods, Inc., 399 F.2d 600, 602–603 (7th Cir. 1968); National Labor Relations Board v. Golden Age Beverage Company, 415 F.2d 26, 31 (5th Cir. 1969). Effective rebuttal was not hampered by the legal, rather than factual, character of any dispute over the pricing program. Under these circumstances, we can only conclude that the petitioners have failed to satisfy their burden of proof in this Court that the representation election was unfair and the Board's certification of the Union arbitrary. National Labor Relations Board v. Mattison Machine Works, 365 U.S. 123, 81 S.Ct. 434, 5 L.Ed.2d 455; Follett Corp. v. National Labor Relations Board, 397 F.2d 91 (7th Cir. 1968); Macomb Pottery Company v. National Labor Relations Board, 376 F.2d 450, 453 (7th Cir. 1967).

■ Apart from the election process itself, petitioners contend that the Union's role in allegedly fostering an illegal price-fixing scheme renders it unfit to act as the bargaining agent of these employees and that the Board should deny recognition to the Union. Whether considered as a ground for denying a representation election[1] or as an independent justification for the refusal to bargain about wages and conditions of employment, we find this argument without merit.

■■ The National Labor Relations Act was intended to encourage the formation and development of private means for the settlement of labor disputes through collective bargaining between management and the employees' representative. 29 U.S.C. § 151. The Act establishes a strong public policy favoring the free choice of a bargaining agent by employees which should not lightly be frustrated. 29 U.S.C. §§ 151, 157; National Labor Relations Board v. David Buttrick Company, 399 F.2d 505, 507 (1st Cir. 1968).[2] Denial of recognition to the Union would run counter to these firmly established policies. It would not only nullify past efforts at organization, but it would also impede future effective exercise of the employees' rights to organize and engage in concerted activities protected by Section 7 (29 U.S.C. § 157). It would foreclose not only a potentially illegal arrangement but also legitimate negotiation and settlement of disputes over wages and conditions of employment.

Neither public antitrust policy nor the proper interest of petitioners warrants this interference with bargaining. Antitrust enforcement does not call for the sweeping and drastic sanction of union nonrecognition. *Cf.* Leedom v. International Union, 352 U.S. 145, 150, 77 S.Ct. 154, 1 L.Ed.2d 201. The dealers are not compelled to enter into any agreement violative of the Sherman Act. Nor are they foreclosed from a timely presentation of the questions whether a price scheme constitutes a mandatory subject of bargaining and, if so, whether the particular scheme violates the antitrust

1. See Intertype Company v. National Labor Relations Board, 401 F.2d 41, 43 (4th Cir. 1968), certiorari denied, 393 U.S. 1049, 89 S.Ct. 686, 21 L.Ed.2d 691.

2. Unlike the present case, those instances relied upon by petitioners in which the Board has denied recognition of the chosen union involved a conflict of interest or some other indication that the un-ion could not fairly perform its fiduciary function as representative and bargaining agent of its members. See, *e. g.*, Alaska Salmon Industry, 78 NLRB 185 (1948); American District Telegraph Co., 89 NLRB 1635 (1950); Bausch & Lomb Optical Co., 108 NLRB 1555 (1954); General Teamsters, Local 249, 139 NLRB 605 (1962); Iowa Packing Co., 125 NLRB 1408 (1959).

laws.[3] A decertification proceeding under Section 9(c) (29 U.S.C. § 159(c)) would also be available if it appears that a majority of the employees no longer support the Union at the end of the year. National Labor Relations Board v. Gissel Packing Co., 395 U.S. 575, 613, 89 S.Ct. 1918, 23 L.Ed.2d 547. These procedures adequately protect the dealers and public from a possibly illegal price-fixing scheme without the needless disruption of labor-management relations. Local 1976, Carpenters' Union v. National Labor Relations Board, 357 U.S. 93, 108–111, 78 S.Ct. 1011, 2 L.Ed.2d 1186; cf. Southern S. S. Co. v. National Labor Relations Board, 316 U.S. 31, 47, 62 S.Ct. 886, 86 L.Ed. 1246; H. L. Washum, 172 NLRB No. 40, 61 et seq., 68 LRRM 1535, 1539–1541 (1968). The policy of the National Labor Relations Act favors a minimum of governmental interference and the Board is properly reluctant to intrude into the realm of union-management relations until necessary. Here petitioners refused to bargain on any subject before any proposal, legal or illegal, mandatory or permissive, had been presented by the Union. This refusal was precipitous and excessive. Minnesota Mining and Manufacturing Company v. National Labor Relations Board, 415 F.2d 174, 177–178 (8th Cir. 1969); General Electric Company v. National Labor Relations Board, 412 F.2d 512, 522–523 (2d Cir. 1969).

The petition for review is denied; enforcement of the order of the Board is granted.

FAIRCHILD, Circuit Judge (concurring).

My conclusions on the critical issues are as follows:

(1) According to the record of the January 28, 1968 meeting, the union proposed to agree with a number of competing employers that none of them would sell a car for less than a price computed by the specified formula. I have no doubt that such agreements would have been unlawful, and I think the board and its officers had a duty to recognize that fact.

(2) The illegality of the proposed device did not conclusively establish that the union was not a labor organization under the act. The regional director's failure to require the disclaimers or similar precautions suggested by the employers, before ordering an election, was not an abuse of discretion.

(3) The record does not disclose the circumstances of the campaign immediately preceding the election. We do not know the extent to which the union pressed its proposal, the extent of information the employees received as to its illegality, nor circumstances indicating probability that it had a significant effect. It has not been established that the election and resulting certification ought to be disregarded. The fraud, if any, was on the employees, not the employers.

(4) I can concur in enforcement of the bargaining order on the ground that it is implicit, without express modification, that if the union proposes agreements fixing minimum prices, the employers will have no duty to bargain.

HASTINGS, Senior Circuit Judge (dissenting).

With deference to my distinguished colleagues in the majority, I dissent from their conclusions on the antitrust issue raised by the employer-dealers throughout this proceeding. The majority adequately sets out the contents of the challenged price-fixing proposal and it need not be repeated here. The general propositions of law relied upon by the majority may be accepted without

---

3. Thus petitioners could themselves institute proceedings against the Union under Section 8(b) (3) (29 U.S.C. § 158(b) (3)) should they feel that the Union unfairly insists upon an unfair or illegal item in bargaining. Without expressing any opinion on the merits of the antitrust allegations, we note that the Board approved the trial examiner's ruling that petitioners need not bargain on price-fixing.

much dispute. However, I have been unable to accept their application to the facts of the case before us.

I agree with the majority that the employer-dealers' antitrust challenge to the elections is properly before us. This challenge was vigorously pressed at every step leading to the elections and was consistently brushed aside by the Board. Raising the same contention once more as a post-election objection would have been a futile gesture.

I further agree with the majority's implicit recognition that the Board is competent, *under proper circumstances*, to consider questions of antitrust law as they relate to its responsibilities under the Labor Act. The Board, in its brief in a companion case, Borek Motor Sales. Inc. v. N. L. R. B., 425 F.2d 677 (1970), concedes, "It is, of course, true that the Board in administering the Labor Act cannot completely close its eyes to violations of other statutes which may come to its attention or which are enmeshed in the factual situations on which the Board must pass. "* * * [T]he Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives.' Southern S. S. Co. v. N. L. R. B., 316 U.S. 31, 47, 62 S.Ct. 886, 86 L.Ed. 246 (1942)." In H. L. Washum, 172 NLRB No. 40 (1968), the Board considered the merits of a charge that a contract it was ordering reinstated violated the antitrust laws. Thus it appears that the central question before us is whether the alleged antitrust violation was prematurely presented to the Board.

The majority suggests two reasons for not denying enforcement. First, it is said that the Board properly refused to consider the employers' antitrust contention before the election because Board intervention to correct improper campaign tactics is warranted only in exceptional cases and that in all others, the proper remedy for an aggrieved party is "counter-propaganda."

The short answer is that *this is an exceptional case* warranting Board action. The cases cited by the majority for the usual rule are simply different from that before us. In some, the alleged misrepresentation was trivial or of only doubtful impropriety. In others, it was highly speculative whether the alleged misrepresentation had any effect on the election outcome. In each case, a single union and one employer were involved and access to employees for counter-propaganda presented no problem for either party. And finally, all of those cases dealt with challenges made only after the election was held so that the only remedy the Board could have granted for the alleged wrong would have been to set aside the election.

The instant case is significantly different in each respect. Here the misrepresentation was neither trivial nor of doubtful impropriety. The Union proposed a panacea for problems that had long troubled employers and employees alike. It said it would secure benefits for the employees and would not harm the business of the employers in the process. It contended that it would in fact do a great service to the dealers by making it possible for them to eliminate the severe competition that had been holding their profits to a minimum. This was a proposal of clear appeal.

However, it was also one that the Union certainly could not implement because of the antitrust laws. The Union's pricing scheme, if implemented, would be a clear *per se* violation of the Sherman Act. The crux of the proposal is that the Union would, through its collective bargaining agreement, participate in fixing a minimum price, below list, at which all automobiles in the Chicago area would have to be sold. The purpose of such price-fixing would be to guarantee the employer-dealers a minimum profit of three percent on each car sold.

"Congress feared the concentrated power of business organizations to dominate markets and prices. It intended [by the Sherman Act] to outlaw busi-

ness monopolies. A business monopoly is no less such because a union participates, and such participation is a violation of the Act." Allen Bradley Co. v. International Brotherhood of Electrical Workers, 325 U.S. 797, 811, 65 S.Ct. 1533, 1541, 89 L.Ed. 1939 (1945). The dealers who were to be involved in this price-fixing scheme were clearly a "non-labor group." *Cf.* American Federation of Musicians v. Carroll, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968). But assuming *arguendo* that they were not, a violation still exists because the proposed scheme was not intended to compensate the dealers for their labor services in competition with salesmen but was calculated to give them an "entrepreneurial profit." *See* Musicians v. Carroll, *supra*, 391 U.S. at 110 n. 10, 888 S.Ct. 1562.

Also present in the instant case is evidence that this clearly improper proposal had a substantial effect, not only on the outcome of the election, but on the very ability of the Union to get the required showing of interest to hold the election. The record before us and before the Board shows that the Union had been trying to organize automobile salesmen in the Chicago area since 1961, apparently without much success. The campaign that led to the present cases began early in November, 1967, and had the support of the Communications Workers of America, AFL–CIO. It also seems to have faltered for in January, 1968, the AFL–CIO withdrew its support. It was at this point, on January 28, 1968, that the succeeding Union group first proposed its pricing scheme which it touted as a method to secure greater financial benefits for salesmen while at the same time saving employers from the harsh competition in the Chicago area. The prospects for the Union immediately brightened. Numerous representation petitions were filed. The number finally rose to between 80 and 90, covering dealerships widely scattered in Illinois and Indiana.

This then suggests another reason for considering the instant case exceptional.

Here 80 or 90 widely scattered employers were faced with the organized campaign of a single Union. They might reasonably have concluded that the usual weapon of counter-propaganda would be ineffective in this situation, or at least that such propaganda could not be adequately prepared and dispersed in the time remaining before the elections.

However, and finally, the employers did not then simply sit back idly to await the outcome of the elections before raising any objection. Instead, they immediately went to the Board with two alternative proposals. They asked that either the Union be required to obtain another showing of interest after disavowing the alleged price-fixing scheme, or that the elections be delayed until the Union submitted proof that it had informed all those who signed authorization cards that it had abandoned its pricing proposal. In my judgment, this procedure was not unreasonable in the circumstances and neither we nor the Board should insist that counter-propaganda was the only acceptable pre-election method for dealing with the problem faced by the dealers. The point is that the employers acted before the election when it was possible to remedy the problem without setting aside an election on the basis of hindsight.

In sum, in light of the obvious illegality of the Union proposal, the early and reasonable request of the employers for assistance, the ease with which the Board could have remedied the clear abuse, the possible inefficacy of counter-propaganda and the evidence of the effect of the proposal on the organizational campaign, it seems that it was a clear abuse of discretion for the Board to permit the elections to proceed without taking any steps to insure that the free choice of the employees was not distorted by the proposed illegal pricing scheme.

The second reason advanced by the majority for not denying enforcement is that until the Union actually presses its illegal proposal in collective bargaining no harm can result from the election

having been held. As I read the record before us this approach ignores the realities of the situation. I am convinced that the Union, unable to secure adequate employee support in any other way, won the election on the strength of its illegal proposal. It should not thereafter be given the opportunity to purge itself by the simple expedient of renigging on its major campaign promise. The net result of this would be to enable the Union to get its foot in the door and thereafter to assume recognized bargaining status, for at least one year. The taint that has pervaded the entire representation process thereby would be brushed aside. To such an anomalous result I am unwilling to subscribe.

All parties seem to suggest that this particular problem is presently without judicial precedent. It would not be enough for me to say now that future collective bargaining in this case shall not encompass illegal price-fixing. Rather, I would hold that elections already held, under the circumstances found present here, should be set aside. No other adequate remedy is presently available.

In my considered judgment the petition to review and set aside the order of the Board should be granted and the cross-application for enforcement denied.