**BOREK MOTOR SALES, INC.,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 17325.

United States Court of Appeals,
Seventh Circuit.

April 8, 1970.

George B. Christensen and Richard F. Vitkus, Chicago, Ill., for Borek Motor Sales, Inc., Petitioner; Winston, Strawn, Smith & Patterson, Chicago, Ill., of counsel.

Marcel Mallet-Prevost, Asst. Gen. Counsel, John D. Burgoyne, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Janet C. McCaa, Atty., N. L. R. B., for respondent.

Before HASTINGS, Senior Circuit Judge, FAIRCHILD and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

This petition asks us to set aside an order of the National Labor Relations Board requiring petitioner to cease and desist from threatening employees with discharge for giving assistance to the Union [1] and to reinstate a discharged employee.

Petitioner is a Pontiac automobile dealer in Blue Island, Illinois. In pertinent part, the evidence on which the trial examiner based his findings shows that on November 15, 1967, a salesman from another Pontiac agency gave Ralph Ambriz, one of petitioner's salesmen and its assistant sales manager, six to eight envelopes containing literature and authorization cards of the Union. Ambriz distributed three of these envelopes to fellow salesmen Howard Riley, Al Donohue, and Ralph Teeter. When petitioner's general manager, Robert Farino, asked about the material which the salesmen were examining, Ambriz explained that it was union literature with authorization cards. Before Ambriz had read the material, Farino approached him and took the material. He next reached for the material in Teeter's possession. When Teeter responded that he had not finished reading it, Farino remarked to him: "If you are going to sign, don't bother then, because I'll fire you first." Although Farino denied this and another salesman testified that he had not heard such a threat, the trial examiner credited the testimony of Ambriz, Riley and Teeter, all of whom attested to the threat.

Forty-five minutes later, Ambriz retrieved two of the envelopes and their enclosures from the wastebasket in Farino's office. About November 17, Ambriz received signed authorization cards from Riley, Donohue, and possibly sales-

1. American Federation of Professional Salesmen Organizing Committee, Local 5056, Communications Workers of America, AFL-CIO. Since January 31, 1968, the Union has been known as American Federation of Professional Salesmen, Local 5056, Unaffiliated.

man Sam Conti. Ambriz placed the cards with his own in an envelope which he dropped into petitioner's mailbox for posting to the Union, but Teeter mailed his card directly to the Union. The Union received only Teeter's authorization card. Consequently, in early December, the other salesmen executed new authorization cards which Teeter then mailed to the Union.

Petitioner's president, Ted Borek, learned of the Union's organization effort on November 15, when Farino called it to his attention. Borek referred to it as follows:

"All of a sudden * * *, a situation of this kind comes up and they don't confide in you. All of a sudden the air is pretty thick. I don't know why it should be. I didn't like it."

At a November 21 breakfast meeting with his salesmen, Borek told them that union organization was their privilege. He also advised them that if there were a union, the entire state should be organized or customers would go to other Illinois towns to obtain cheaper automobiles.[2] He said "he wouldn't want to be a victim of the one individual [on the opposing team], which would be joined in the union," and that union membership "was not a fancy [cure] for the ills of the world."

On January 6, 1968, according to the credited testimony, Farino asked Ambriz for some information about a meeting of the Union to be held on January 7. Because of an interruption, Ambriz did not respond, but he "knew" that Farino would have been against the meeting. On the same day, Ambriz volunteered to drive petitioner's other four salesmen to the meeting. All five of them were in attendance on the following evening.

Teeter considered that from time to time salesman Conti passed information along to Farino. On January 8, Farino learned from Conti that the scheduled meeting to organize the Union had taken place. Farino "assumed" that some of his salesmen were present, but he did "not for sure" know whether Teeter had attended. On the evening of January 8, Teeter was discharged by Farino. Farino asserted that the discharge was prompted by Teeter's poor sales record, including his refusal to send letters to and telephone prospective customers. Teeter protested his discharge, telling Farino that he was "only three cars behind the top man." Although ill from about Christmas 1967 until early January, Teeter was actually only two delivered cars behind Ambriz in December.

Apart from disagreeing with his interpretation of Borek's November 21 breakfast talk, the Board adopted the examiner's findings and held that petitioner violated Section 8(a) (1) of the National Labor Relations Act (29 U.S.C. § 158(a) (1)) by threatening Teeter with discharge if he signed a union card, and that it violated Section 8(a) (3) of the Act (29 U.S.C. § 158(a) (3)) by discharging him for joining and supporting the Union. We conclude that the Board's order must be enforced.

*The Cease and Desist Order*

■ There was substantial evidence from which the Board could conclude that the petitioner violated Section 8(a) (1) of the Act by virtue of the coercive threat of its sales manager Farino. Three witnesses testified to the threatened discharge of Teeter should he sign the Union's authorization card. In spite of this clear infringement of the employees' Section 7 organizational rights by their supervisor, Borek now claims that the Board should not have issued the cease and desist order. Petitioner asserts that the violation was isolated and was, in any event, "cured" by the remarks of the Company's president on November 21. We disagree.

There is no need to engage in a prolonged discussion of the issuance of cease and desist orders predicated upon

---

2. We accept the Board's repudiation of the examiner's interpretation that unless the unionization was statewide, Borek was threatening to move his dealership from Blue Island.

isolated instances of insignificant or technical violations of the National Labor Relations Act.[3] Here a review of the findings of the Board evinces that the violation was neither isolated nor insignificant. The threat of discharge is one of the most effective coercive weapons available to management. National Labor Relations Board v. Louisville Chair Company, 385 F.2d 922, 926 (6th Cir. 1967), certiorari denied, 390 U.S. 1013, 88 S.Ct. 1264, 20 L.Ed.2d 163. Moreover, after warning Teeter, Farino virtually confiscated the union literature and authorization cards and discarded them in his wastebaske whence the employees were forced to retrieve them. There is even evidence suggesting that signed authorization cards placed in the Company's mailbox were removed and prevented from reaching the Union. Some months after these events, Farino quizzed Ambriz concerning a union meeting to be held that night. On the following day, Farino learned from Conti of the meeting and, that same day, discharged Teeter who had attended the meeting. The Board was certainly justified in construing these events as indicating a continued expression of hostility to the Union which intimidated Borek's employees.

■ Nor do we accept petitioner's contention that president Borek's November 21 breakfast remarks vitiated the unwholesome effects of Farino's actions. These remarks were not the "specific, and unambiguous assurances to employees" present in Playwood Plastics Co., Inc., 110 NLRB 306, 313 (1954). Viewed in the context of the overall behavior of petitioner, his remarks fail to undercut the Board's conclusions or the propriety of its cease and desist order. See Time-O-Matic, Inc. v. National Labor Relations Board, 264 F.2d 96, 99–100 (7th Cir. 1959); National Labor Relations Board v. Marsh Supermarkets, Inc., 327 F.2d 109, 112 (7th Cir. 1963), certiorari denied, 377 U.S. 944, 84 S.Ct. 1351, 12 L.Ed.2d 307.

*The Discriminatory Discharge*

Petitioner next argues that its discharge of Teeter did not violate Section 8(a) (3) prohibiting the discriminatory discharge of an employee to discourage membership in a labor organization. Borek contends that the dismissal was the result, not of any anti-union animus on its part, but of the poor performance of Teeter as a salesman.

■■ It is well settled that the presence of valid grounds for an employee's discharge does not legalize a dismissal which was nevertheless due to a desire to discourage union activity. National Labor Relations Board v. Symons Manufacturing Co., 328 F.2d 835, 837 (7th Cir. 1964); Nachman Corp. v. National Labor Relations Board, 337 F.2d 421, 423–424 (7th Cir. 1964); see also National Labor Relations Board v. Stafford Trucking, Inc., 371 F.2d 244, 247 (7th Cir. 1966). In this case, assuming *arguendo* that Teeter's sales performance would have justified dismissal, there was substantial evidence from which the Board reasonably inferred that the discharge was not based solely upon that ground and was therefore illegal.

3. Petitioner is not well supported by the Board's occasional refusal to issue cease and desist orders in such situations. See, e. g., West Texas Utilities Co., 85 NLRB 1396 (1949), enforced, 87 U.S.App. D.C. 179, 184 F.2d 233 (1950), certiorari denied, 341 U.S. 939, 71 S.Ct. 999, 95 L.Ed. 1366; Atlas Storage Division, P & V Atlas Industrial Center, Inc., 112 NLRB 1175 (1955), enforced, Chauffeurs, Teamsters & Helpers, Etc. v. N. L. R. B., 233 F.2d 233 (7th Cir. 1956). The role of courts in determining the propriety of particular orders is radically different from the wide discretion which Congress has bestowed upon the agency. Cf. L. & H. Trucking, Inc., 155 NLRB 104, 104–105, 116 (1965); see also Jaycox Sanitary Service of Garden Grove, Inc., 161 NLRB 544, 545 (1966). Moreover, under the proper circumstances, the Board has determined that even an isolated interference with Section 7 rights requires such an order. E. g., Lever Brothers Company, 163 NLRB 194 (1967).

■■ In addition to Farino's threat to fire Teeter which was made in the presence of other employees, there was evidence from which the Board could have inferred that the Company, through Farino, was aware of his continued activity with the Union. The timing of the discharge also supports the inference that Teeter was fired in order to make good the threat and support its intimidating effect on his fellow employees. Cf. National Labor Relations Board v. American Casting Service, Inc., 365 F.2d 168, 171–172 (7th Cir. 1966); National Labor Relations Board v. Camco, Incorporated, 340 F.2d 803, 811 (5th Cir. 1965), certiorari denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339; National Labor Relations Board v. Ambox, Incorporated, 357 F.2d 138, 142 (5th Cir. 1966). Unlike Broadway Motors Ford Inc. v. National Labor Relations Board, 395 F.2d 337 (8th Cir. 1968), relied upon by petitioner, here were not only a coercive threat and other indicia of anti-union bias, but also less than convincing evidence that Teeter was an employee whose job performance had long marked him for discharge. See National Labor Relations Board v. Harry F. Berggren & Sons, Inc., 406 F.2d 239, 246, note 10 (8th Cir. 1969), certiorari denied, 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 74. Considering the totality of the evidence, the Board's determination that Teeter's discharge violated Section 8(a) (3) of the Act was supported by substantial evidence and the reinstatement remedy was appropriate.

*Compliance with the Administrative Procedure Act*

It is next urged that the Board failed to comply with the requirements of Section 557(c) of the Administrative Procedure Act [4] by failing to state its reasons for overruling each exception pertaining to the discriminatory discharge issue.

■■ The purposes of the procedural requirements outlined in Section 557(c) are to preserve objections in the record and to inform the parties and any reviewing body of the disposition of the case and the grounds upon which the agency's "decision" is based. By its terms, the statute only requires the Board to rule on each exception, not to state the reasons therefor. In its decision here, the Board stated that it had considered the exceptions of the Company and nevertheless adopted the examiner's findings, conclusions and recommendations (except with respect to his interpretation of president Borek's November 21 statements). By adopting the trial examiner's opinion in this fashion, the Board adequately presented the findings, conclusion, and reasons therefor which the Administrative Procedure Act requires. The Board indicated that it passed upon each exception presented by the Company. Some exceptions were discussed in the decision; the others obviously were overruled, for the Board adopted "the findings, conclusions, and recommendations of the Trial Examiner, as modified herein." More than that is not demanded by the statute and would place a severe burden upon the agency for which no justification has been presented. The substance of petitioner's contention has been considered and consistently rejected, with respect to the National Labor Relations Board as well as other agencies of the Government. National Labor Relations Board v. Process Corporation, 412 F.2d 215, 217 (7th Cir. 1969); American President Lines, Ltd. v. National Labor Relations Board, 340 F.2d 490, 492 (9th Cir. 1965); Division 1142 v. National Labor Relations Bord, 111 U.S.App.D.C. 68, 294 F.2d 264, 268 (1961); National La-

---

4. That Section provides in pertinent part (5 U.S.C. § 557(c)):

"The record shall show the ruling on each finding, conclusion, or exception presented. All decisions, including initial, recommended, and tentative deci-

sions, are a part of the record and shall include a statement of—

"(A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record."

bor Relations Board v. Wichita Television Corporation, 277 F.2d 579, 585 (10th Cir. 1960), certiorari denied, 364 U.S. 871, 81 S.Ct. 113, 5 L.Ed.2d 93; National Labor Relations Board v. Sharples Chemicals, Inc., 209 F.2d 645, 652–653 (6th Cir. 1954); National Labor Relations Board v. State Center Warehouse & Cold Storage Co., 193 F.2d 156, 158 (9th Cir. 1951); see also Minneapolis & St. Louis Ry. v. United States, 361 U.S. 173, 193–194, 80 S.Ct. 229, 4 L.Ed. 2d 223.

### The Alleged Antitrust Violation

Although petitioner no longer seriously challenges that the Union is a labor organization within the meaning of Section 2(5) of the Act (29 U.S.C. § 152(5) ), it does contend that an alleged price-fixing proposal of the Union contemplates a violation of the Sherman Act and therefore should cause the Board to withhold its processes from the Union as the charging party and deny the protection of the National Labor Relations Act to the employees joining it.

 Petitioner cannot use the asserted antitrust violation as a shield to justify its own improper actions in resistance to unionization. Petitioner could have countered illegal union propaganda without employing the coercive threat and unfair discharge which this record reveals. If the Union should ultimately win representational rights at the Borek concern, petitioner could not then be compelled to violate the antitrust laws by accepting an illegal provision in its contract. Schmerler Ford, Inc. v. National Labor Relations Board, 424 F.2d 1335 (7th Cir. 1970). The appropriate time to consider the legality of the Union's plan will be if the Union places it before petitioner as a matter for compulsory bargaining. Cf. Retail Clerks International Association v. National Labor Relations Board, 125 U.S. App.D.C. 63, 366 F.2d 642, 648 (1966),

certiorari denied, 386 U.S. 1017, 87 S.Ct. 1373, 18 L.Ed.2d 455. Under these circumstances the Board was not presently required to decide whether the proposal violated the Sherman Act. Cf. Leedom v. International Union, 352 U.S. 145, 77 S.Ct. 154, 1 L.Ed.2d 201.

The petition for review is denied; the cross-petition for enforcement is granted.

FAIRCHILD, Circuit Judge, concurring.

I agree in all respects except that my views with respect to the alleged price-fixing proposal and the Board's duty to recognize its illegality are set forth in my concurring opinion in Schmerler Ford, Inc. v. National Labor Relations Board, 424 F.2d 1335 (7th Cir. 1970).

HASTINGS, Senior Circuit Judge dissenting.

On this review we are first asked to consider whether there is substantial evidence on the record considered as a whole to support the Labor Board's finding and holding that the employer, Borek Motor Sales, Inc.,[1] violated Section 8(a) (1) of the National Labor Relations Act[2] by threatening its automobile salesman, Ralph E. Teeter, with discharge if he signed a union card, and that Borek violated Section 8(a) (3) of the Act[3] by discharging Teeter for joining and supporting the union.

With deference to the majority, as I read and understand the record before us, I do not find substantial evidence to support the Board's challenged findings and would deny enforcement of its resulting order.

In the first half of 1967, Borek's sales organization was critically depleted. Faren, a new car salesman, died first. Bonn, the used car manager, died next. Verdett, the general sales manager, was the third one to die. Farino, another salesman of 14 years' experience, was

---

1. Ted A. Borek was president of Borek Motor Sales, Inc., and reference is made herein to each as Borek.

2. 29 U.S.C.A. § 158(a) (1).

3. 29 U.S.C.A. § 158(a) (3).

promoted to general sales manager following Verdett's death. White, another long time experienced salesman, quit his job because he was not promoted to general sales manager instead of Farino. About seven salesmen were a normal complement.

Borek and his manager, Farino, became quite concerned and made a desperate effort to recruit experienced salesmen. Teeter came to their attention through Donohue, another salesman. Teeter was an experienced salesman with a good record. Borek employed him. He started to work on September 18, 1967. His sales performance did not meet Borek's expectations and Borek began insisting to Farino, during November and December, that Teeter be discharged. However, Farino wanted to give Teeter further opportunity to make good. Finally, Teeter became ill and was hospitalized in late December. Farino persuaded Borek to defer the discharge until Teeter had another week to try again after his return. Finally, Farino called Teeter into a private conference on the evening of January 8, 1968. After reviewing in detail Teeter's unsatisfactory work and sales performance, Farino discharged him. No reference was made at that time to any labor organization. Borek was not present during this final interview but as early as the middle of November, 1967 had been suggesting that this step should be taken. It was Borek, not Farino, who had insisted upon the discharge.

The Board overruled the Examiner and found that Mr. Borek had no anti-union animus. I cannot believe that Farino's isolated statement made on the first day of the union organizational campaign, and the attendant impulsive incidents, before any salesman had signed a union card, is entitled to the controlling effect accorded to it by the Board. A week later, Borek in effect purged this alleged statement of any ad-

verse effect in his breakfast meeting with the salesmen. Later all salesmen signed union cards. No one else was discharged. Apparently there were only five salesmen in the entire group.

I have carefully reviewed the entire record pertaining to the Teeter discharge. I am compelled to conclude that the discharge was for valid, well supported economic reasons.[4]

I have further concluded, on considering the record as a whole, that the Board's findings that the employer Borek threatened Teeter with discharge and later discharged him for protected union activities in violation of Sections 8(a) (1) and 8(a) (3) of the Labor Act, are not supported by substantial evidence. On this basis, I would deny enforcement of the Board's order.

I do not reach the alleged antitrust violation in this case. I have separately stated my views thereon in my dissent to the companion case of Schmerler Ford, Inc. et al. v. National Labor Relations Board, 424 F.2d 1335 (1970), consolidated for hearing with the instant case.

---

4. The majority opinion notes Teeter's testimony, together with a December, 1967 statistic, indicating Teeter's favorable sales record. A countervailing summary could be shown from the record. In any event, the employer was not satisfied and exercised a legitimate prerogative of management.