**UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

Star Expansion Industries Corp., Intervenor.

No. 21056.

United States Court of Appeals District of Columbia Circuit.

Argued March 11, 1968.

Decided Feb. 11, 1969.

Mr. Frank J. Donner, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. David Rein, Washington, D. C., was on the brief, for petitioner.

Mr. John D. Burgoyne, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Mrs. Nancy M. Sherman, Atty., National Labor Relations Board, were on the brief, for respondent.

Mr. Sidney Orenstein, New York City, with whom Mr. Milton Eisenberg, Washington, D. C., was on the brief, for intervenor.

Before BAZELON, Chief Judge, and BURGER and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge:

This is a proceeding initiated by petitioner to review an order of the National Labor Relations Board which found the intervenor employer guilty of certain violations of Section 8(a) (1) and (3) of the Act, but dismissed other portions of the complaint which alleged Section 8(a) (5) violations as well as other infractions of § 8(a) (1) and (3). Because intervenor voluntarily complied with the affirmative aspects of the Board's order, only the Board's failure to sustain the other charges in the complaint is at issue here. Petitioner offers a number of challenges, most of which are of the familiar factual character which turn upon credibility determinations or involve the weighing of the evidence adduced in adversary proceedings.[1] One claim of error, however, derives from essentially undisputed circumstances, and presents a novel and substantial issue of law. We deal in detail only with it, but, as in the case of the more routine points, we find no warrant for interference with the Board's dispositions.

I

Star Expansion Industries Corporation ("Company") was unionized by the International Brotherhood of Electrical Workers ("IBEW") in 1957, and, in the years which followed, a series of collective bargaining agreements were concluded between them. In anticipation of the expiration of the last of these in the spring of 1964, petitioner United Electrical, Radio and Machine Workers of America ("UE") instituted at the close of 1963 an organizing effort to replace IBEW. The campaign was strenuous, and included accusations by UE that the contracts between the Company and IBEW had been fraudulent and collusive. An election under Board auspices was held on March 4, 1964, which was won by UE in a close vote. The Company made no objection to the certification of UE, which occurred on March 10—one day before the current IBEW contract expired.[2]

---

1. A broadside attack on the Board's order is made on the ground that the trial examiner was biased. This claim, made for the first time here and not included in the exceptions filed with the Board, need not be noticed by us. National Labor Relations Act § 10(e), 29 U.S.C. § 160(e) (1964); Alabama Roofing &

Metal Co. v. NLRB, 331 F.2d 965, 967 (5th Cir. 1964). In any event, our reading of the record indicates that this particular claim, as an independent ground of reversible error, is frivolous.

2. UE complains here of the dismissal of the charge in its complaint that the Company was responsible for the circula-

In an attempt to negotiate a new contract, the Company and UE met thirty-eight times between March 23, 1964 and January 13, 1965. UE first presented its demands at the second meeting. The more important of these were:

1. A twenty cent per hour across the board wage increase.

2. A contract term of two years.

3. With some modifications, the retention from the prior IBEW contract of union security, checkoff, grievance arbitration, and management rights clauses.

At the third meeting, the Company characterized UE's money demands as "staggering." It asked for more time to make its money offer, but did advance some other counterproposals at that meeting. In view of the narrow margin of UE's electoral victory, the Company declined to grant union security or check-off provisions; and it suggested a contract term of one instead of two years. The Company also proposed new provisions for management rights,[3] subcontracting, and grievance arbitration.

The Company's grievance arbitration proposal called for arbitration of any dispute involving an interpretation or application of the contract, and it was accompanied by bans on strikes or lockouts in defiance of the arbitration procedure. The clause then provided that the arbitrator could, in the event of a forbidden strike or lockout, order it to cease, and seek judicial enforcement of such order in the state courts of New York. In aid of this last provision, the clause included a waiver by both parties of any right to remove the suit to the federal courts.

Two later meetings in April, on the 20th and 23rd, were devoted primarily to UE's demand for a union security clause. The Company representative stated that "at the present time there are no conditions under which the Company will agree to a Union Shop." On April 24, without any prior notice, from 225 to 240 workers went on strike. This strike lasted only three days, however, and on April 27, when the parties met again, they agreed to have a mediator from the New York State Mediation Service present at all succeeding meetings. At the April 28 meeting, the parties reviewed the situation for the mediator, and the Company agreed to put the union shop proposal "back on the table," offered an improved call-in pay clause, three days bereavement pay, and promised a wage proposal at the next meeting.

The next week the Company made its money offer, and UE modified its money demands. During the remainder of May, there were eight further meetings. These were devoted almost entirely to discussions of union security, grievance arbitration, subcontracting, and management rights, UE insisting that the economic issues would be easily taken care of when "these big four issues" were settled. At these meetings the Company agreed to several UE requests, and submitted new drafts of the grievance arbitration clauses, which for the most part eliminated the time limits on filing grievances. UE proposed that the provision authorizing injunctions for violations of the no-strike clause be eliminated, and

---

tion during the bargaining period of anti-UE petitions. The examiner found that the Company was not responsible for the petitions, noting that "[T]he General Counsel, himself, stated on the record that the papers were IBEW papers brought by IBEW people for IBEW people." The Board adopted this finding, and we think the record entitled it to do so. The issue was simply one of whether the Company sponsored, overtly or covertly, this anti-UE effort. We think the examiner so understood the issue in receiving and weighing the evidence, and we find no warrant for the various contentions that he misconceived and mishandled the question.

3. The proposed management rights clause was more specific than that contained in the old IBEW contract, because the Company claimed it wanted its rights specifically delineated in view of UE's accusations that the IBEW contract had been collusively administered. In a subsequent meeting on May 12, the Company agreed to delete certain provisions from its proposed clause.

suggested a subcontracting clause which allowed the Company to subcontract on the condition that "the provisions of this Agreement, including the Union shop provision," apply to the subcontractor's employees.

On June 1, UE warned the Company that, if it did not significantly modify its positions on the "big four" issues, there would be a strike. The Company said that further concessions on subcontracting and grievance arbitration were possible, but not on union security. The next day, June 2, about one-half of the Company's 400 employees went out on strike, the other half reporting to work. However, the Company's plant was never shut down because, with replacements subsequently hired, the Company was able to continue operations.[4]

Negotiations were resumed on the 19th of June, and UE's proposals showed substantial concessions. Wage demands were significantly reduced, and UE asked for an agency, as distinct from a union, shop clause.[5] The Company generally adhered to its earlier position on the four major issues, and stated that about 100 of the striking employees had been replaced. At the next meeting UE "tentatively agreed" to the Company's position on the four major issues, but on June 29 when the Company submitted an offer which made the contract run only until March 11, 1965 (the end of UE's certification year) rather than for one year, UE withdrew its agreement. The Company explained its reluctance to contract beyond March 11, 1965, on the ground that it no longer felt that UE represented a majority of the workers.

On June 29, UE asked the Company about the strikers' right to pay during the vacation period which was to begin on July 17. The Company representatives replied that no decision had yet been made. Later, at the July 13 meeting and again on July 16, the Company stated that the strikers were not entitled to vacation pay, both because many of the strikers had been replaced and were therefore no longer employees, and because the old contract did not contemplate vacation pay for strikers. In response to this position, UE said it would both bring suit to collect the pay (which it did in a state court of New York) and file charges with the Board.[6]

---

4. UE in its complaint charged, as an 8(a)(1) violation, that the Company had threatened employees for supporting the strike; and three employees testified that they were told that they would be fired, deprived of future references to other employers, or denied vacations because of their strike activity. The examiner did not believe their testimony, however, and the subsequent adoption by the Board of his findings on this charge appears to be supported by substantial evidence in the record. UE argues that the handling of this issue was wholly vitiated by the examiner's reliance on the Company's failure to execute the alleged threats as evidence that the threats were never made. The Board, however, in one instance, at least, was at pains to note the tangential character of the examiner's statement to that effect. Our own examination of the record, furthermore, shows that the trial examiner based his decision in each instance on the relative credibility of witnesses whose testimony conflicted. His observations that the actions allegedly threatened never eventuated, in this context, did not serve as a functional element in the decisional process. In these circumstances, we see no reason to overturn the Board's determination.

5. Under an agency shop all employees pay dues to the union but need not join.

6. Both the examiner and the Board found that the Company's denial of vacation pay was in violation of Section 8(a)(1) and (3), and required it to be paid. UE asserts that the Company's stand on vacation pay converted what might have begun as an economic strike into an unfair labor practice strike because the Company's refusal to pay prolonged the strike. See United Steelworkers v. NLRB, 132 U.S.App.D.C. 103, 405 F.2d 1373 (1968) (Nov. 5, 1968). The examiner found no such connection and the Board, without discussing the matter in detail, adopted his finding. Although the matter is not free from doubt, we think the finding is supportable. The record indicates that, when the Company's position on vacation pay became known some weeks after the strike started, UE did take a serious view of the matter and did

In the five August meetings the Company stood firm on the four major issues, while stating its readiness, in the event the strike ended, to take back as many strikers as there were openings without discharging any of the replacements hired. The Company further stated that as openings became available it would only hire from those former employees who had gone on strike, and that, once rehired, such workers would be restored to all of their prior rights and privileges except seniority.

On August 27, UE made an unconditional offer for the strikers to return to work, and the next day the Company accepted. On September 1, the Company rehired thirty-three strikers for whom there were immediate openings. The Company refused, however, to rehire a few workers whom it accused of strike misconduct. During September there were three additional meetings at which there were general discussions about the rehiring of striking workers, with particular attention to the Company's refusal to reemploy the workers accused of strike misconduct.[7]

In October, after the Company at UE's request had resubmitted in writing its contract offer, UE stated that it approved the Company's proposed wage increase, but that a number of the other proposals remained unacceptable. The Company on November 9 granted this wage increase retroactive to June 2. By December it appears that each striker, with the exception of those whom the Company accused of misconduct, had received an offer to return to work. Negotiations continued into January, 1965, with no additional progress, and at that time were discontinued. Consequently, no collective bargaining agreement was ever signed.

## II

UE's central claim is that the Company violated Section 8(a) (5) by bargaining to an impasse over the proposed arbitration provision. In particular, UE objects to that portion of the provision which gave the arbitrator the power to bring an action in the state courts of New York to enforce an order by him against violations of the contractual ban of strikes and lockouts. Under the Company's proposal, in the event the arbitrator brought such an enforcement action, both UE and the Company promised not to seek removal to a federal court. UE argues that insistence on this provision is *per se*[8]

---

tell the Company on July 24 that it "would have to be included in any settlement ultimately reached." The issue was brought up again at the August 5 meeting, but the Company said that there was no point in talking about it since it had been put by UE before the courts for resolution. By August 5, the record shows that UE had brought suit in a New York court to recover vacation pay it claimed was due the strikers under the old IBEW contract. Four more meetings in August before the end of the strike evoked no further reference to the question, and it is this circumstance which suggests that the continuation of the strike was not in fact caused by the differences over vacation pay. If the evidence is read in this way, at it could be, the Board's finding is not without evidentiary support.

7. The Board did not reach the merits of the claim of whether there had in fact been misconduct by strikers since, by

reason of its determination that the strike was solely economic in nature, no striker had an absolute right to reemployment. Since we do not disturb the conclusion that this was not a strike in protest of an unfair labor practice, we have no occasion to pursue the misconduct issue, either on the record before us or by remand to the Board.

8. As the Company points out in its brief, the complaint below is not grounded on the theory that insistence on the arbitration grievance proposal was, without more, a *per se* violation of Section 8(a) (5). Before the examiner, however, UE argued not only that the enforcement provisions made insistence on the arbitration grievance clause a *per se* violation, but that the management rights and subcontracting clauses also constituted *per se* refusals to bargain. On this appeal, UE limits its *per se* argument to the arbitration-grievance provisions alone. We deal with the merits of this claim,

a refusal to bargain in good faith, in violation of § 8(a) (5), because:

1. The provisions of the arbitration clause allowing for state court injunctions and requiring waiver of the right to remove to federal courts are not mandatory subjects of bargaining.

2. The provisions are illegal and unenforcible in that

   (1) they attempt to divest the federal courts of jurisdiction in an area where the controlling law is federal law, thereby making it especially important that the federal courts participate in the development of the law, and

   (2) the policies of the Norris-LaGuardia Act make it inappropriate for state courts, as well as federal courts, to enjoin strikes.

The examiner concluded that the provisions of the Company's arbitration proposal were not "so outrageous as to be (in the language of the complaint) 'predictably unacceptable' to a self-respecting labor union, thus resulting in a *per se* violation of 8(a) (5)." In support of this conclusion, the examiner noted that grievance arbitration proposals, including the machinery for their implementation, are recognized subjects for mandatory bargaining, and that the particular provision for no-strike orders by the arbitrator to be enforceable in the state courts did not take them out of this category. The examiner found that, either viewed alone or as part of the other management proposals, the arbitration clause did not demonstrate that the Company was only going through the motions of bargaining with no intention of reaching agreement. The examiner also expressed the opinion that Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), was not to be taken as having preempted the field

to the extent of barring state courts from the injunctive enforcement of an arbitrator's command to stop the violation of a no-strike clause. He thought that UE lost nothing by waiving removal to the federal courts because he viewed *Sinclair* as meaning that Norris-LaGuardia withheld jurisdiction from a District Court even to receive a removed suit seeking an injunction against a strike.

The Board was much less expansive in dealing with the § 8(a) (5) issue. It purported only to be "satisfied from the record as a whole, and in agreement with the Trial Examiner" that the Company had not refused to bargain within the meaning of § 8(a) (5). The Board footnoted this finding with the observation that it did not "deem it necessary to pass upon the Trial Examiner's views regarding preemption and the rights of State and Federal courts in this area."

For the reasons which follow, we uphold the Board, finding no more need than it did to make *ex cathedra* pronouncements as to what the ultimate validity and enforcibility of the provisions in question will prove to be.

### III

We first examine UE's argument that the Company's arbitration proposals were not mandatory bargaining subjects. NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L. Ed.2d 823 (1958), is the fountainhead of the proposition that an employer can violate Section 8(a) (5) by conditioning his agreement to a contract on acceptance of a company proposal which is not within the mandatory subjects of bargaining under Section 8(d). In the Supreme Court's words: "[G]ood faith does not license the employer to refuse to enter into agreements on the ground that they do not include some proposal which is not a mandatory subject of bargaining. * * [S]uch conduct is, in substance, a refusal to bargain about the subjects that are within the scope of mandatory bargain-

despite the imprecision of the complaint, because the examiner did consider the issue in this posture, and the Company has

made no claim of lack of notice or surprise.

ing." 356 U.S. at 349, 78 S.Ct. at 723 (1958).

■ A bargaining proposal is a mandatory subject of bargaining if it falls within the scope of "wages, hours, and other conditions of employment" under Section 8(d). Although these categories are far from self-defining, the case law shows that grievance arbitration,[9] and no-strike clauses [10] are mandatory subjects for bargaining. It is the policy of the federal labor law to foster arbitration. As the Supreme Court said in United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578, n. 4, 80 S.Ct. 1347, 1350, 4 L. Ed.2d 1409 (1960) (citations omitted) (footnote included):

> The present federal policy is to promote industrial stabilization through the collective bargaining agreement. A major factor in achieving industrial peace is the inclusion of a provision for arbitration of grievances in the collective bargaining agreement. Complete effectuation of the federal policy is achieved when the agreement contains both an arbitration provision for all unresolved grievances and an absolute prohibition of strikes, the arbitration agreement being the 'quid pro quo' for the agreement not to strike.

Given this federal policy of promoting industrial peace through a combination of no-strike clauses and effective arbitration provisions, there can be no question but that such proposals are mandatory subjects of bargaining.

■ Because the specific provisions to which the Union objects in this case are essentially part of the arbitration and no-strike proposals, they are, as components of such proposals, mandatory subjects of bargaining. UE is, in effect, complaining about the proposed means by which the Company suggested the parties insure compliance with their promises to arbitrate disputes. These provisions merely describe the specific way in which the grievance arbitration and no-strike clause are to function. For that reason they bear just as much a relationship to wages, hours, and working conditions as does any typical arbitration and no-strike clause, and are consequently bargainable.

UE relies on two cases in support of its argument to the contrary. The first is Local 164 v. NLRB, 110 U.S.App.D.C. 294, 293 F.2d 133, cert. denied, 368 U.S. 824, 82 S.Ct. 42, 7 L.Ed.2d 28 (1961), which held that a union failed to bargain in good faith because it insisted to a point of impasse on a proposal which required an employer to give a performance bond. The court held that this proposal was not a mandatory subject of bargaining because "a performance bond has nothing to do with the performance of work but is a condition which must be met before work is even undertaken." Relying on Local 164 as an analogy, UE argues that a performance bond is a far less invidious means of insuring compliance with a collective bargaining agreement than the injunction and waiver proposals the Company proposed here.

Local 164 is not apposite to the case at hand for several reasons. First, and most significant, is the fact that the proposed performance bond in Local 164 was found to have nothing to do with an

---

9. NLRB v. United Nuclear Corp., 381 F. 2d 972, 976–978 (10th Cir. 1967) (employer's unilateral change in grievance procedure, which is one of the "working conditions which are the mandatory subject of collective bargaining," violates 8(a)(5)); Industrial Union of Marine & Shipbuilding Workers v. NLRB, 320 F. 2d 615, 620 (3rd Cir.), cert. denied, 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1963) ("We agree with the Board that both seniority rights and a grievance procedure are within 'wages, hours, and other terms and conditions of employ-

ment' and hence are mandatory bargaining subjects."); NLRB v. Celotex Corp., 364 F.2d 552, 553 (5th Cir.), cert. denied, 385 U.S. 987, 87 S.Ct. 601, 17 L. Ed.2d 450 (1966). See Hughes Tool Co. v. NLRB, 147 F.2d 69, 73, 158 A.L.R. 1165 (5th Cir. 1945) ("We take it to be a proper matter for collective bargaining to establish an orderly and just method for presenting and adjusting grievances.").

10. Allis-Chalmers Mfg. Co. v. NLRB, 213 F.2d 374, 378 (7th Cir. 1954).

arbitration system to resolve disputes which arose out of the performance of work. Judge Edgerton, in his dissent in *Local 164*, argued that, since a "union may insist on a provision for arbitration," the union could insist upon the performance bond because "if adopted, [the performance bond] would have been part of a system of arbitration." The majority rejected Judge Edgerton's argument not because they disagreed with his premise that the parties could insist to the point of impasse "on a provision of arbitration" but rather because they found that "the parties [had] exhibited no such arbitration plan." It therefore concluded that the performance bond could not be considered part of an arbitration scheme. The second reason UE's reliance on *Local 164* is misplaced is that a performance bond "is a condition which must be met before work is even undertaken" and therefore has the effect of preventing companies (or unions) which lack sufficient financial means from ever entering into collective bargaining agreements. As the Ninth Circuit said in holding that performance bond proposals were not mandatory subjects of bargaining: "The statutory obligation to bargain is not limited and cannot be limited to financially responsible parties, whether employer or labor union." NLRB v. International Hod Carriers, 384 F.2d 55, 57 (1967), cert. denied, 390 U.S. 920, 88 S.Ct. 853, 19 L.Ed.2d 980 (1968), quoting from Excello Dry Wall Co., 145 N.L.R.B. 663, 664 (1963). The Company's proposals, unlike a performance bond, do not in any way discriminate against the poorer party.

The second case upon which UE relies is NLRB v. Dalton Telephone Co., 187 F.2d 811 (5th Cir.), cert. denied, 342 U.S. 824, 72 S.Ct. 43, 96 L.Ed. 623 (1951), which held that a company could not make its acceptance of a contract conditional upon the union's registering under a state law so as to make the union an entity amenable to suit in the state courts. It might be argued that the waiver provision in the case at hand, like the demand for registration in *Dalton Telephone*, was simply a means of enabling the company to sue the union in a state court. In *Dalton Telephone*, however, the court strongly suggested that the company's insistence on the union registration was simply a ploy to avoid reducing to writing an agreement to which the parties had already agreed. More importantly, however, the proposal in *Dalton Telephone*, was again not a means to effectuate an arbitration clause, but simply a way to insure that the union could be sued for money damages in a state court.

### IV

We now turn to UE's contention that the Company refused to bargain in good faith because the proposed arbitration clause collides inescapably with national labor policy. As part of this argument, UE seems to contend that the Company cannot be taken seriously in suggesting a voluntary relinquishment by UE of the right to seek the shelter of the federal courthouse whenever its walk-outs are challenged.

Central to the resolution of this claim is the statutory standard of good faith—a concept which gathers meaning from the immediate circumstances of the actual bargaining situation. The question before us is one of whether, under the circumstances as they existed when the bargaining took place, the proposals made to shield the arbitration of grievances from the disruptions of strikes and lockouts, were so at odds with national labor policy as to make the Company's motives patently meretricious. The issue is one of the Company's good faith, not its infallibility as a legal prophet. Consequently, the Company can in no sense be thought to have made a mockery of the bargaining process if, at the time of the bargaining, its vision of what was permissible under national labor policy was reasonable, whatever the Supreme Court's view of the matter might ultimately prove to be.

We look, then, to the context in which the bargaining took place in 1964. In 1960 the Supreme Court had in *Warrior*

& *Gulf* given powerful impetus to the use of arbitration for the settlement of grievances, and it was at pains to say that "complete effectuation" of this federal policy is attained only when the arbitration clause is accompanied by "an absolute prohibition of strikes." Two years later, however, a majority of the court in *Sinclair* dealt what the three dissenters termed "a crippling blow to the cause of grievance arbitration itself." Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 227, 82 S.Ct. 1328, 1345, 8 L.Ed.2d 440 (1962). There the Court held that Norris-LaGuardia disabled the federal courts from giving to an employer injunctive relief against a work stoppage over an arbitrable dispute and in violation of a no-strike clause.

Because of UE's historic lack of enthusiasm for arbitration and its proclaimed preference for the settlement of disputes by more direct means [11] the Company felt it especially important to devise some way, without running afoul of *Sinclair*, to make the arbitration and no-strike promises effective. It first thought to differentiate *Sinclair* by lodging in the arbitrator, and not in itself, the power to decide when to seek judicial relief against the breach of the no-strike clause, thereby making it the neutral, and not a party to the labor dispute, who is the suitor for the injunction. And it sought the further or alternative assurance of prior consent by the parties to the arbitrator's utilization of the state courts to protect the integrity of the arbitration process.[12]

The record in no way supports a conclusion that the Company made its arbitration proposals as a means to avoid reaching agreement with UE. The Company never declared its proposal to be sacrosanct or beyond discussion. Our examination of the record shows that, in the lengthy and prolonged bargaining between these parties, both altered early positions on this and other issues in the ebb and flow of the bargaining.[13] The Company's bargaining conduct, does not suggest to us, any more than it did to the Board, an employer implacably opposed to the intrusion of a collective bargaining agreement into the employment relationship.

■ We also reject UE's argument that, quite apart from its conduct, the Company violated Section 8(a) (5) by putting forward protective provisions for arbitration hopelessly in conflict with judicial and legislative concepts of national labor policy. A party may, of course, make proposals so patently beyond the

11. The record contains excerpts from UE's official Steward's Manual which suggested that workers' rights are often destroyed by arbitration, and that readiness to stop work over a grievance more often led to a favorable settlement. A UE publication stated it had "no great objection" to the following characterization of its policy by BNA—a national labor service reporter:

> Primary reliance on the strike or strike threat to settle grievances, rather than arbitration is reaffirmed as the policy of the unaffiliated Electrical Workers. * * *

12. C. D. Perry & Sons, Inc. v. Robilotto, 39 Misc.2d 147, 240 N.Y.S.2d 331 (Sup. Ct.1963), aff'd 23 A.D.2d 949, 260 N.Y.S. 2d 158 (1965), had held that the Norris-LaGuardia Act did not apply to the states, and that under New York law an injunction against a strike in breach of a collective bargaining agreement was permissible. For a discussion of the practices in various states, *see generally,* Aaron, Labor Injunctions in the State Courts (pts. I & II), 50 VA.L.REV. 951, 1147 (1964); Note Specific Enforcement of No Strike Clauses: The Enigma of Sinclair v. Atkinson, 19 RUTGERS L. REV. 507, 526–527 (1965).

13. UE was far from steadfast in its opposition to the particular arbitration provisions which it now claims were "predictably unacceptable." At one point during the negotiations in June, UE "tentatively agreed" to a contract which included this proposal, and requested the Company to go ahead with the preparation of a written agreement for execution. However, because of subsequently revealed differences over when the proposed contract would expire, this tentative accommodation broke down. We nonetheless assume, of course, that the Company did bargain to an impasse over the grievance arbitration proposal.

pale of legal acceptability that he may well be regarded as moved only by a cynical resolve to render the bargaining meaningless.[14] But that does not appear to have been the case here, for at the time this bargaining took place the Company could in good faith have believed that it proposals would prove legally enforcible. In particular, the Company might have reasonably believed that (1) *Sinclair* would not be extended to the enforcement of an arbitrator's restraining order, (2) the Norris-LaGuardia prohibition against injunctions would not apply to the states, and (3) the federal courts probably did not have removal jurisdiction over actions brought in state courts for injunctive relief.

We do not purport to know whether, in some litigation not now before us, a proposal like that made by the Company here will in fact turn out to be enforcible. Time may prove the Company's legal hypotheses misconceived. The examiner has, while this case has been under submission to us, been proved wrong in his assumption that UE would, even without waiving its right to do so, be unable to remove the arbitrator's suit to the federal court.[15] During this same period, however, the Supreme Court declined to review a decision of the Fifth Circuit that *Sinclair* does not prevent a federal district court from enforcing an arbitrator's order directing a union to terminate work stoppages in violation of a no-strike clause.[16] All this proves is that legal forecasting like meteorological forecasting, is an inexact science.

■■ The examiner's failure to anticipate accurately the outcome of *Avco*

does suggest that the Board was well-advised not to become entangled in his legal speculations, and, instead, to found its decision upon an inquiry solely into the Company's good faith in the context of the actual bargaining. Where either an employer or a union has made a novel proposal which it could reasonably believe would prove enforcible, it would seem neither fair nor desirable to make the duty to bargain in good faith turn on a decision as to the proposal's ultimate enforcibility. Such a test would mean that the parties would have either to avoid innovative proposals, or to be sufficiently clairvoyant to guess the eventual resolution of difficult and open questions of law. It would also require initially the Board, and subsequently the court, to decide the legality of contract proposals not in the context of a specific dispute, but in the abstract. Finally, it is important to remember in this regard that, under both the letter and spirit of the National Labor Relations Act, neither the Board nor the courts normally "directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." N. L. R. B. v. American Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1950).

The Company's arbitration proposals were responsive to import and rather clear objectives of national labor policy. We need not determine the feasibility of those proposals, but only whether their advancement in the circumstances of this

14. It has been said, for example, that a company can not bargain over whether it will recognize a union as exclusive representative of the workers, *see* Simplicity Pattern Co., 102 N.L.R.B. 1283 (1953), Deena Artware, Inc., 86 N.L.R.B. 732 (1949), or the extent of the bargaining union's recognition, *see* Bethlehem Steel Co., 89 N.L.R.B. 341 (1950).

15. *See* Avco Corp. v. Aero Lodge No. 735, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968). Before the Supreme Court's decision, however, the circuits had been

in conflict over this issue. *Compare* the Sixth Circuit's opinion in Avco, 376 F.2d 337 (1967) *with* that of the Third Circuit in American Dredging Co. v. Local 25, 338 F.2d 837 (1964), cert. denied, 380 U.S. 935, 85 S.Ct. 941, 13 L.Ed.2d 822 (1965).

16. New Orleans Steamship Ass'n v. General Longshore Workers, 389 F.2d 369, cert. denied, 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968) (U.S., Oct. 14, 1968) (No. 116).

record did, without more, convict the Company of bad faith. We find no error in the Board's conclusion that it did not.

The petition for review is

Denied.