815 F.2d 797
 125 L.R.R.M. (BNA) 2040
 DEPARTMENT OF the NAVY, et al., Petitioners/Cross-Respondents,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent/Cross-Petitioner.
Portsmouth Federal Employees Metal Trades Council, AFL-CIO,
Intervenor.
 No. 86-1506.
 United States Court of Appeals,
First Circuit.
 Argued Dec. 3, 1986.
Decided March 31, 1987.
 
 Mark B. Stern, Dept. of Justice, with whom William Kanter, Dept. of Justice, and Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., were on brief for petitioners/cross-respondents.
 William E. Persina, Deputy Sol., with whom Ruth E. Peters, Sol., Arthur A. Horowitz, Associate Sol., and Elsa D. Newman, Washington, D.C., were on brief for respondent/cross-petitioner.
 Ellen C. Boardman with whom Sally M. Tedrow, Nicholas R. Femia and O'Donoghue & O'Donoghue, Washington, D.C., were on brief for intervenor.
 Thomas A. Woodley, Gregory K. McGillivary, Edward J. Hickey, Jr., General Counsel, and Mulholland & Hickey, Washington, D.C., on brief for Public Employee Department, AFL-CIO, amicus curiae.
 Mark D. Roth, General Counsel, Charles A. Hobbie, Deputy General Counsel, and Robert S. Trotner, Staff Counsel, on brief for American Federation of Government Employees, AFL-CIO, amicus curiae.
 Before BOWNES, TORRUELLA and SELYA, Circuit Judges.
 TORRUELLA, Circuit Judge.
 
 
 1
 The question presented by this appeal is whether this Court should enforce a ruling by the Federal Labor Relations Authority (FLRA) to the effect that the Department of the Navy (Navy) and the Portsmouth Naval Shipyard (Shipyard) committed unfair labor practices in violation of 5 U.S.C. Sec. 7116(a)(1) and (8)[1] by failing to comply with an arbitration award. We conclude that the FLRA's order is unenforceable. A detailed discussion of both the factual and legal background is required for a proper understanding of our decision.
 
 
 2
 Because the principal statute involved, the Federal Service Labor-Management Relations Statute (the Act), 5 U.S.C. Secs. 7101-7135 (1982 & Supp. III 1985), is one of fairly recent enactment, and up to now, of limited application in this circuit.[2] we commence with a general discussion of this virgin territory.
 
 
 3
 I. Labor-management relations in the federal service
 
 
 4
 The Act embodies a statutory scheme, originally conceived in a 1962 Executive Order,[3] for the establishment of a law of labor-management relations for the federal public service "analogous to that of the National Labor Relations [Act] in the private sector." Bureau of Alcohol, Tobacco & Firearms v. FLRA, 464 U.S. 89, 92-93, 104 S.Ct. 439, 441-42, 78 L.Ed.2d 195 (1983). Cf. 29 U.S.C. Sec. 141 et seq. It thus creates an administrative agency, the FLRA, to administer the Act in a manner similar to the National Labor Relations Board. 5 U.S.C. Secs. 7104, 7105. As in private industry, the Act expressly protects the rights of federal employees "to form, join, or assist any labor organization, or to refrain from any such activity," Sec. 7102, and provides mechanisms for the resolution of questions concerning representation in collective bargaining units. Secs. 7111, 7112.[4] Also as in private sector labor-management relations, the Act establishes the representation rights and duties of labor organizations accorded exclusive representation of employees, Sec. 7114, and causes specified actions by certain Executive agencies, or by labor organizations, to be deemed unfair labor practices, Sec. 7116,[5] against which the FLRA may take appropriate administrative, Sec. 7118, and if necessary, judicial action. Sec. 7123(b).
 
 
 5
 There are, however, several significant substantive and procedural differences between the Act and the private sector labor-management stratagems which are relevant to the present appeal. In private sector labor-management relations, the establishment of grievance and arbitration procedures, although considered a mandatory subject of bargaining, United Elec., Radio and Mach. Workers of America v. NLRB, 409 F.2d 150 (D.C.Cir.1969), is left totally dependent upon the outcome of negotiation by the parties. Thus, such procedures need not ultimately be agreed to or contained in a collective bargaining contract provided this outcome is reached in good faith. Under the present Act, however, perhaps because federal employees are prohibited from engaging in strikes and certain other forms of concerted activities, Sec. 7116(b)(7), Sec. 7311, 18 U.S.C. Sec. 1918, it is specifically required that "any collective bargaining agreement provide procedures for the settlement of grievances." 5 U.S.C. Sec. 7121(a)(1). With the exception of certain matters not relevant here,[6] those "procedures shall be the exclusive procedures for resolving grievances which fall within its coverage." Id. Furthermore, paragraph (b) of Sec. 7121 establishes certain minimum substantive and procedural matters that must be contained in "[a]ny negotiated grievance procedure," and specifically requires that the contract include a provision "that any grievance not satisfactorily settled under the negotiated grievance procedure shall be subject to binding arbitration...." Sec. 7121(b)(3)(C).
 
 
 6
 Pursuant to Sec. 7122(a) of the Act either party to the arbitration may file exceptions to the award with the FLRA, which may review the same to determine if the award is deficient "(1) because it is contrary to any law, rule, or regulation; or (2) on other grounds similar to those applied by Federal courts in private sector labor-management relations." Under Sec. 7122(b), if no exception is filed with the FLRA during "the 30-day period beginning on the date of such award, the award [becomes] final and binding,"[7] and "[the] agency shall take the actions required by [the] arbitrator's final award."[8] There is, of course, no equivalent procedure under the Taft-Hartley Act to that previously described, enforcement or challenge to arbitration awards being left to private action in court pursuant to Section 301(a) of that statute. 29 U.S.C. Sec. 185(a); see Textile Workers Union v. Lincoln Mills of Ala., 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957).
 
 
 7
 An important feature of the Act, another one not present in private sector legislation, is making the failure to comply with a binding arbitration award an unfair labor practice. See 5 U.S.C. Sec. 7116(a)(8), ante at footnote 1. Violation of Sec. 7116(a)(8) is considered "interference with, restrain[t] and coerc[ion] [of] employee[s] in the exercise of ... right[s] under [the Act]," and thus is automatically a violation of Sec. 7116(a)(1) thereof.
 
 
 8
 As in the case of the National Labor Relations Board, 29 U.S.C. Sec. 160, orders of the FLRA are not self-enforcing but require the aid of the courts of appeals. See 5 U.S.C. Sec. 7123(a).[9] In addition, a party aggrieved by a final order of the FLRA can also seek review of such an order by the courts of appeals, such as has been done in the present case. Id.
 
 
 9
 The scope of review by the courts is relevant to the issues before us:
 
 
 10
 ... Review of the [FLRA's] order shall be on the record in accordance with section 706 of this title. No objection that has not been urged before the [FLRA], or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances. The findings of the [FLRA] with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. If any person applies to the court for leave to adduce additional evidence and shows to the satisfaction of the court that the additional evidence is material and that there were reasonable grounds for the failure to adduce the evidence in the hearing before the [FLRA], or its designee, the court may order the additional evidence to be taken before the [FLRA], or its designee, and to be made a part of the record....
 
 
 11
 5 U.S.C. Sec. 7123(c).
 
 
 12
 As we all know, Sec. 706 referred to above, which is at the heart of the Administrative Procedure Act, 5 U.S.C. Secs. 551 et seq., provides in part that agency action shall be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]." 5 U.S.C. Sec. 706(2)(A).
 
 
 13
 We turn to the issues before us within the framework of this legal structure.
 
 II. The grievance
 
 14
 The Federal Employees Metal Trades Council (Union) is the bargaining representative of the Shipyard employees. A collective bargaining agreement was entered into between the Union and the Shipyard.
 
 
 15
 On October 2, 1981, the Union filed a grievance on behalf of the employees working on the overhaul operations of submarine SSN 674 alleging that the employees were working in a hazardous environment because of exposure to asbestos. The Union claimed this violated Article 29 of the collective bargaining agreement.[10] Thereafter, on October 13, a general grievance was filed relating to all bargaining unit employees who work on the entire overhaul of submarines in the Shipyard. The employees involved in this grievance did not work with asbestos or work in submarines during the removal of asbestos (referred to as "a ripout"). The remedies sought were that the employer replace all asbestos materials on board those submarines under overhaul, and compensate unit employees with environmental pay for asbestos exposure.[11]
 
 III. The arbitration award
 
 16
 On November 16, 1981, the grievance was denied. The Union then took the grievance to arbitration.
 
 
 17
 On the first issue before the arbitrator, whether the Shipyard had violated Article 29, Section 1 of the collective bargaining agreement, he ruled against the Shipyard. The arbitrator held that the Shipyard's reliance on the then prevalent OSHA standard for occupational exposure to airborne asbestos, .1 fibers/cc., was inappropriate. The arbitrator concluded that there was no such thing as a "safe" level of exposure to airborne asbestos fiber. He proceeded to rule that the OSHA standard was inapplicable because it was contrary to prevailing scientific evidence, which the arbitrator accepted in place of the OSHA standard.
 
 
 18
 Although asbestos exposure was concededly below the OSHA level, the arbitrator ruled that there was "room for corrective action to remove potential sources of airborne asbestos fibers on submarines and make the work place safer." He then proceeded to give four examples of possible action that could be taken by the Shipyard to improve conditions: (1) the marking of asbestos lagging[12] which was not removed, (2) more lagging removal during the ripout stages, (3) providing more durable and effective covering on the unremoved lagging, and (4) the establishment of more frequent surveillance in high risk areas. He also found that the "air monitoring techniques which [were] in general use [left] something to be desired."
 
 
 19
 From the above, the arbitrator concluded that the Navy had "not made every reasonable effort to provide and maintain safe working conditions," and thus had violated Article 29, Section 1 of the collective bargaining contract. See ante at footnote 10.
 
 
 20
 The arbitrator's decision on the second issue, whether environmental pay was required under Article 20, Section 1 of the contract and Appendix J of the Federal Personnel Manual, see ante at footnote 11, followed suit as a consequence of the first ruling. He held that Category 16 of Appendix J "require[d] that employees receive environmental pay when 'protective devices and safety measures have not practically eliminated the potential for' illness or injury due to exposure to asbestos fibers," and that since the Navy had "not consistently exployed [sic] safety measures which would practically eliminate the potential for illness due to exposure to asbestos fibers," a valid grievance had been presented. The Navy was "directed to take corrective action, consistent with [this] decision, with respect to all submarine overhauls which [began] after receipt of this award."
 
 
 21
 On the question of environmental pay, the arbitrator ruled in favor of a prospective award. The prospective standard "adopted [was] a format which focuses on the efforts made by the [Navy] to eliminate unnecessary exposure, or unnecessary potential exposure, to airborne asbestos, without reference to an arbitrary threshold" (emphasis supplied). The arbitrator retained jurisdiction for 90 days "to resolve any issue which may arise with respect to this award." The award was dated July 28, 1983.
 
 
 22
 On September 23, 1983, the Shipyard submitted certain requests for clarifications of the award. The Shipyard asked "what airborne asbestos levels and what degree of reduction in the potential for generating airborne asbestos [were] considered to represent a condition that [was] consistent with the outside environment." The arbitrator answered that "[i]n the Award [he] ... expressly rejected the use of a standard for environmental pay based upon arbitrary exposure levels," because he found "[i]t is more compatible with the wording of Appendix J to focus on the elimination of unnecessary sources, or unnecessary potential sources of exposure to airborne asbestos." The arbitrator then referred to the second and third full paragraph at page 24 and the second paragraph on page 25 of the award as the basis for this statement.[13]
 
 
 23
 In the meantime the Union had on September 14, 1983 requested clarification on three points, two of which are relevant to this appeal: (1) whether "all employees assigned to work on boats without respirators [were] entitled to ... [e]nvironmental [p]ay, from July 28, 1983 [on]," and (2) whether "[e]nvironmental [p]ay [would] continue to be paid employees assigned to work on the boats without respirators until such time that the hazard no longer exists or a testing method is developed which ... clearly indicate[§ that] the atmosphere in the boats [is] as asbestos fiber free or the [outside] atmosphere...."
 
 
 24
 On October 26, 1983, the arbitrator ruled on the Union's clarification requests. He replied in the negative to items (1) and (2). He indicated that "[t]he intent of the Award [was] that environmental pay be paid when circumstances or conditions which increase the potential for exposure to airborne asbestos ... [were] not corrected." (emphasis supplied). He again made reference to the third full paragraph of the award on page 24 as the basis for this statement. He also stated "that employees [were entitled to] receive environmental pay if they are exposed to conditions like those described on page 23 of the Award." Finally the arbitrator concluded that "[t]he minimal increased exposure to airborne asbestos ... which is caused solely by working in submarines which contain asbestos materials does not trigger entitlement to environmental pay."
 
 
 25
 IV. Exceptions to the award filed before the FLRA
 
 
 26
 While its requests for clarification were still pending before the arbitrator, the Shipyard on October 21, 1983 filed exceptions with the FLRA, which were renewed on November 9 and 25, 1983 after the arbitrator's ruling on the Shipyard's clarifications. The Union also filed exceptions to the award on November 23, 1983.
 
 
 27
 Nothing was heard from the FLRA on these exceptions until June 27, 1984, when it ruled that the exceptions of both parties should be dismissed as untimely filed. See Portsmouth Naval Shipyard, 15 F.L.R.A. 181 (1984). The FLRA concluded that the retention of jurisdiction for 90 days by the arbitrator did not extend the 30 day time limit for filing exceptions provided by Sec. 7122(b) of the Act, see ante 799, or Section 2425.1 of the FLRA's Rules and Regulations. See 49 Fed.Reg. 22623 (1984).
 
 
 28
 The FLRA's conclusion in this respect was not appealed, and has become the law of the case. In any event, since we are bound to "uphold reasonable and defensible constructions" of the Act by its administering agency, and we cannot in good faith state that the FLRA's construction in this respect is totally "inconsistent with [the] statutory mandate or that [it] frustrate[s] the congressional policy underlying [the] [Act]," such a ruling by the FLRA would likely be binding upon us in any event. See NLRB v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965); Dept. of Air Force v. FLRA, 775 F.2d 727, 732 (6th Cir.1985).
 
 V. The unfair labor practice proceedings
 
 29
 While the FLRA was still deciding whether or not to consider the pending exceptions to the arbitrator's award, the General Counsel of the FLRA issued an unfair labor practice complaint on March 30, 1984 charging the Navy and the Shipyard with continuing violations of Sections 7116(a)(1), (5)[14] and (8) of the Act because of their alleged failure to comply with the arbitration award. A hearing before an administrative law judge (ALJ) resulted in a decision on April 29, 1985. The ALJ held that respondents had failed to comply with the award and thus had violated Section 7116(a)(1) and (8) of the Act. It is this decision that is before us.
 
 
 30
 To begin with, the ALJ ruled against the Shipyard's contention that it was not required to comply with the award while the exceptions were pending. He found that the award was final and binding upon the parties from the time when the period for filing exceptions to the award under Section 7122(b) expired. He also ruled that the award was not ambiguous, and that in any event, since timely objections were not filed, the respondents were barred from challenging the award in the unfair labor practice proceeding.
 
 
 31
 In concluding that the award had not been complied with the ALJ found that the award mandated four corrective actions. See ante at page 801. He proceeded to analyze the evidence presented with regard to each of these "problem" areas as reflected in the various submarines overhauled in the Shipyard after the award became final. To summarize: the ALJ found that the Shipyard made efforts to correct the "problems" in all of these four areas, but that the actions of respondents were not sufficiently satisfactory to have fully corrected these defects.
 
 
 32
 As to the payment of the environmental differential, he found that respondents paid this differential only in cases of actual exposure to asbestos by an employee. To receive this pay the employee was required to follow the procedure established in Article 20 of the collective bargaining contract.[15] The ALJ found that requiring employees to follow this procedure before receiving environmental pay was a violation of the arbitration award. He also rejected the Navy's argument to the effect that the award could best be "appropriately interpreted through the negotiated grievance procedure." Finally, he concluded that since the award states that the existence of "the circumstances and conditions described in items 1 through 4 on page 23 [of the award] ... necessarily increase[d] the potential for exposure to airborne asbestos, over that which is inherent due to the general presence of asbestos" (emphasis supplied), and since respondents had not corrected these conditions to the satisfaction of the ALJ, there was a "triggering" of the circumstances whereby employees working in those submarines were entitled to receive the environmental pay differential. As to the method of payment of this differential, "the negotiated grievance procedure [i.e., Art. 20, Sec. 3, was rejected because it] would further complicate rather than expedite the process" (emphasis supplied). The Shipyard's argument that this procedure was necessary to ensure that each recipient was exposed to the unsafe conditions was also refused because he held that "[s]ince employees are entitled to [this pay] for potential as well as actual exposure," and "[p]otential exposure is a continuous state," "[t]his solution actually creates more problems than it solves." (Emphasis supplied).
 
 
 33
 In conclusion, the ALJ recommended that the FLRA issue an order that the Navy and the Shipyard cease and desist from failing to comply with the award and produce the records necessary to determine the back pay due to the employees.
 
 
 34
 Exceptions were filed by the Navy and the Shipyard before the FLRA, but the FLRA, with minor exceptions not relevant here, adopted the findings and recommendations of the ALJ and ordered the Navy and the Shipyard "to fully comply with [the] ... July 28, 1983 arbitration award, including the payment of environmental differential pay."
 
 VI. The appeal
 
 35
 The Navy and the Shipyard petitioned this Court for review. The FLRA cross-petitioned for enforcement of its order, and the Union moved, and was granted, leave to intervene in the appellate proceedings. Two other labor organizations have also filed briefs as amici.
 
 
 36
 The Shipyard argues that the FLRA erred in determining that the Navy committed an unfair labor practice by failing to pay the environmental differential for potential as well as actual exposure to asbestos and by dispensing with the contractual procedures for establishing environmental pay. The Shipyard contends that the FLRA has "rewritten the arbitrator's award, abrogated the clear provisions of the collective bargaining agreement, and improperly imposed a major monetary liability on the United States." The Shipyard submits that enforcement should be denied and that the case should be remanded for resolution through the contractual grievance procedure or to seek clarification of the award from the arbitrator.
 
 
 37
 The FLRA seeks enforcement of its order claiming that the Navy committed an unfair labor practice by failing to comply with the award in carrying out the corrective measures "to eliminate the potential for illness due to employees' exposure to airborne asbestos," and by failing to pay the environmental differential in the absence of such corrective measures. The FLRA argues that the failure to take the corrective actions triggers the pay requirement and that no further application or action need be made by the employee for the pay under Article 20, Section 3 of the contract. The FLRA also claims this Court lacks jurisdiction to consider the Shipyard's 7123(a) petition.
 
 VII. Discussion
 
 38
 The FLRA argues that the Shipyard's failure to file timely exceptions to the arbitration award deprives this court of jurisdiction to review the unfair labor practice order. This misstates what we are reviewing. We are reviewing the unfair labor practice order, not the arbitration award. Though the latter is binding because of the failure of the parties to file timely exceptions, the former remains subject to judicial review. See 5 U.S.C. Sec. 7123(a).
 
 
 39
 Since it is claimed that the Navy and the Shipyard failed to comply with the arbitration award, we start by analyzing the requirements of that decision upon appellants as compared with the findings of the FLRA. Although recognizing that the Navy had "done much to eliminate exposure to airborne asbestos at the Shipyard" and had complied with the OSHA standards as required by the 1977 arbitration award, the arbitrator established a new prospective standard "to substantially reduce, but not totally eliminate, [the asbestos] risk." The arbitrator, in place of a measurable threshold of pollution, i.e., one as to which appellants can be held accountable by objective criteria, "adopted a format which focuses on the efforts made by the [Shipyard] to eliminate unnecessary exposure or unnecessary potential exposure" (emphasis supplied). As previously narrated, the arbitrator gave four examples of corrective action that could be taken to make the work place safer: marking the asbestos lagging, removal of more asbestos during ripouts, use of better covering on unremoved asbestos, and more frequent surveillance of high risk asbestos areas.
 
 
 40
 Passing on to the decision of the ALJ, he found that although the Shipyard had taken steps in all the "problem" areas to correct the defects signaled by the arbitrator, only in the area of increased surveillance had the Shipyard performed to his satisfaction. Thus, he concluded, the Shipyard had violated the award and committed an unfair labor practice. Yet the ALJ offers no guidance by which we can objectively determine whether appellants' efforts are sufficient to meet the arbitrator's award. This is particularly the case when we consider that the four actions indicated by the arbitrator were, in the arbitrator's own language, "measures designed to substantially reduce, but not totally eliminate, [the] risk." Thus, it was contemplated that some level of asbestos would always be present, yet the Shipyard has no way of knowing what actions taken by the Shipyard will be satisfactory to the ALJ. In fact, since the four indicated actions are only "examples" of corrective action to be taken, it could very well be argued that even if those actions were fully complied with to the satisfaction of the ALJ, the Shipyard would still be bound to take other, unspecified measures. As the administrative judge found, other safety measures were in fact taken by the Shipyard[16] but apparently, it was given little or no credit for them.
 
 
 41
 In our view, the exercise of such unbridled authority by the ALJ is neither contemplated by the law nor justified by the circumstances, and constitutes an abuse of discretion by the FLRA within the meaning of the Administrative Procedure Act. 5 U.S.C. Sec. 706(2)(A). See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413-16, 91 S.Ct. 814, 822-23, 28 L.Ed.2d 136 (1970). By transforming examples into rigid requirements, and by failing to consider the totality of the remedial actions taken by the Shipyard in response to the arbitration award, the ALJ severely distorted the essence of the award.
 
 
 42
 There are at least two additional reasons why this Court should exercise jurisdiction and decline enforcement of the FLRA's order. First, the FLRA fatally misconstrues the arbitrator's ruling and nullifies specific provisions of the collective bargaining agreement. As previously indicated, the arbitrator's "clarification" of the union's request was to the effect that not all employees assigned to work on boats without respirators were entitled to the environmental pay differential. Ante at 802. The arbitrator contemplated that asbestos could not be totally eliminated from the atmosphere, but could only be lowered to levels which would reduce or eliminate asbestos illness. Id. Yet the ALJ found that employees were entitled to environmental pay for potential as well as actual exposure to asbestos. This conclusion clearly misinterprets the award and Appendix J, which requires environmental pay for "expos[ure] of employees to potential illness" (emphasis added), not potential exposure f employees. Consistent with Appendix J, the arbitrator did not require environmental pay for mere potential exposure of employees to asbestos, but only for exposure to potential illness. The FLRA is thus abusing its discretion in seeking enforcement of a decision by an ALJ which misconstrues both the arbitrator's award and the contract. 5 U.S.C. Sec. 706(2)(A).
 
 
 43
 Second, the ALJ has rewritten the collective bargaining agreement in violation of 5 U.S.C. Sec. 706(2)(A) in ruling that employees can ignore the provisions of Article 20, Section 3 of the agreement establishing the procedure for the claiming and payment of environmental pay. The ALJ concluded that following this procedure "would further complicate rather than expedite the process." That may be, but that procedure is what the parties bargained for. Certainly, the binding arbitration award to which the unfair labor practice charge was addressed neither required nor suggested any such shortcut. Environmental pay is a contractual creation, and an ALJ can no more overlook what the parties contracted as the method of enforcing the payment of environmental pay than he can ignore the existence of the other contract provisions upon which the payment of environmental pay is based. All parts of the contract must be applied as contemplated by the parties to the agreement, not as envisioned by a non-contractual third party. Such action by the ALJ is nothing short of legislation, and is contrary to established labor relations law. United Steelworkers of Am. v. Enterprise W. & C. Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) ("An arbitrator ... does not sit to dispense his own brand of industrial justice").
 
 
 44
 In sum, the FLRA seeks to enforce a decision by the ALJ which allows the ALJ unbridled discretion in the interpretation of the arbitration award, misinterprets and misconstrues the award and the collective bargaining contract upon which it is based, and attempts to ignore specific provisions of that agreement. Having jurisdiction under Sec. 7123(a), we find such actions constitute an abuse of discretion by the FLRA within the meaning of 5 U.S.C. Sec. 706(2)(A). The request for enforcement of the order of the FLRA is denied.
 
 
 45
 We turn next to the Shipyard's petition for review. The Shipyard concedes on appeal the clarity of the award insofar as it rejects the OSHA standard and establishes a new format for corrective action. It is thus unquestionable that the Shipyard must take the actions required by the award. Sec. 7122(b). As to any ambiguity in the implementation of the award, the parties should resort to the negotiated grievance procedure, see Article 20, Sec. 3, to determine compliance with its terms, and the method for the distribution of EDP to those employees affected. Cf. Locals 2222, 2320-2327, Etc. v. New England, Etc., 628 F.2d 644, 649 (1st Cir.1980) (case remanded to the original arbitration board to determine the remedy for a wrongful termination of employment).
 
 
 46
 The petition for review is granted. The case is hereby remanded to the FLRA for proceedings consistent with this opinion. No costs are awarded.
 
 
 
 [1]
 Sec. 7116. Unfair labor practices
 (a) For the purpose of this chapter, it shall be an unfair labor practice for an agency--
 (1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;
 * * *
 (8) to otherwise fail or refuse to comply with any provision of this chapter.
 
 
 [2]
 To the present, only the following First Circuit cases have involved the Act, although in some of these cases the reference has been peripheral. Rybicki v. Hartley, 792 F.2d 260 (1st Cir.1986); Martinez v. Smith, 768 F.2d 479 (1st Cir.1985) (per curiam); American Federation of Government Employees, Local 3013 v. FLRA, 762 F.2d 183 (1st Cir.1985) (per curiam)
 
 
 [3]
 Executive Order No. 10988, 3 C.F.R. 521 (1959-63 Comp.). The Executive Order program was revised and continued by Exec.Order No. 11491, 3 C.F.R. 861 (1966-70 Comp.), as amended by Exec. Orders Nos. 11616, 11636, and 11838, 3 C.F.R. 605, 634, 957 (1971-75 Comp.)
 
 
 [4]
 Under Sec. 7113, a labor organization may be granted "national consultation rights" if certain specified circumstances are met, a "right" which does not exist in the private sector
 
 
 [5]
 The enumerated actions which are unfair labor practices under the Act, 5 U.S.C. Sec. 7116, vary considerably from those in the private sector. Cf. 29 U.S.C. Sec. 158
 
 
 [6]
 See 5 U.S.C. Sec. 7121(a)(2), (d), and (e). American Fed. of Gov. Emp., Locals 225, 1504 and 3723, AFL-CIO v. FLRA, 712 F.2d 640 (D.C.Cir.1983)
 
 
 [7]
 This provision was amended on March 2, 1984 to read "during the 30-day period beginning on the date the award is served on the party." Pub.L. 98-224, Sec. 4, March 2, 1984, 98 Stat. 48
 
 
 [8]
 The use of the phrase "[the] agency" seems to imply that only management is bound by the finality of the award. This is contrary to the specific language in Sec. 7121(b)(3)(C), however
 
 
 [9]
 Section 7123(a) provides:
 (a) Any person aggrieved by any final order of the Authority other than an order under--
 (1) section 7122 of this title (involving an award by an arbitrator), unless the order involves an unfair labor practice under section 7118 of this title, or
 (2) section 7112 of this title (involving an appropriate unit determination),
 may, during the 60-day period beginning on the date on which the order was issued, institute an action for judicial review of the Authority's order in the United States court of appeals in the circuit in which the person resides or transacts business or in the United States Court of Appeals for the District of Columbia.
 
 
 [10]
 Article 29 provides as follows:
 Section 1. Each employee has the responsibility to work safely. The Employer will make every reasonable effort to provide and maintain safe working conditions. The Council will cooperate in these efforts and encourage employees to work in a safe manner.
 * * *
 Section 6. The Employer agrees to furnish protective clothing and safety equipment at no expense to the employee whenever it is required by the Employer for safety or industrial health purposes. The Council at its discretion may recommend new protective clothing and equipment and/or modifications to existing equipment for consideration by the Employer; and such recommendations shall receive prompt attention.
 * * *
 Section 8. The Employer agrees to study any environmental conditions alleged by the Council to be injurious to health or comfort of unit employees including but not limited to high noise, dust and fume, toxic material, high and low temperatures and other potentially harmful and discomforting conditions. Where such study requires a specific test operation, the Council will be given an opportunity to have an observer present during such tests. It is further agreed that where such studies reveal that harmful environmental conditions exist, no employee shall be required to work in such areas until the conditions have been made safe either by correcting same or furnishing adequate protective clothing and/or devices to affected employees.
 
 
 [11]
 Article 20, Section of the collective bargaining agreement provides:
 The Employer shall assign environmental pay to unit employees engaged in hazardous work or work involving difficult working conditions to the extent permitted and prescribed applicable regulations.
 Appendix J of the Federal Personnel Manual contains the schedule of environmental differentials paid for exposure to various degrees of hazards. Part II, Category 16 of Appendix J covers asbestos and grants an 8% pay differential when:
 Working in an area where airborne concentrations of asbestos fibers may expose employees to potential illness or injury and protective devices or safety measures have not practically eliminated the potential for such personal illness or injury.
 See Category 16, Part II, Appendix J, Federal Personnel Manual (Supplement 532-1, April 14, 1980).
 
 
 [12]
 "Lagging" is material used for thermal insulation around a cylindrical object such as a pipe. Webster's New Collegiate Dictionary 644 (1977). For many years, asbestos lagging was routinely used on submarines to insulate pipes and vents in engine rooms, auxiliary machine spaces, reactor areas and other interior compartments
 
 
 [13]
 The second full paragraph on page 24 of the award indicates that employees working inside submarines are exposed to airborne asbestos, which exposure "cannot be practically eliminated" except by the use of respirators, the use of which was rejected by both parties
 In the third paragraph, the arbitrator called attention to the four examples previously referred to, ante at page 801, whereby exposure to airborne asbestos could be reduced.
 The second paragraph on page 25 rejects the OSHA standard and adopts "a format which focuses on the efforts made" to eliminate unnecessary actual or potential exposure to asbestos.
 
 
 [14]
 Sec. 7116. Unfair labor practices
 (a) For the purpose of this chapter, it shall be an unfair labor practice for an agency--
 * * *
 (5) to refuse to consult or negotiate in good faith with a labor organization as required by this chapter.
 See also ante at footnote 1.
 
 
 [15]
 Article 20, Section 3 of the collective bargaining agreement provides:
 Cognizant supervisors, when assigning employees to work for which environmental pay is indicated, shall so inform the employee. If at any time an employee believes that environmental pay is warranted, the employee should call the matter to the attention of his immediate supervisor who will make (or obtain) a determination and advise the employee. The employee may exercise his right to be represented by a Council steward when discussing environmental pay.
 
 
 [16]
 These measures included the formalization of the Asbestos Recovery Control Team, the establishment of an employee awareness program, the development of a water-injection procedure which reduces the risk of asbestos particles remaining after a ripout, the introduction of techniques to isolate areas during "minor ripouts," and the establishment of a spill log to monitor asbestos problems. Additionally, the ALJ found that the Shipyard had requested the National Institute of Occupational Safety and Health to conduct research and to develop a new air monitoring technique, and that this technique was in fact developed and was in the process of being implemented